**FILED**
**United States Court of Appeals**
**Tenth Circuit**

**May 25, 2012**

**Elisabeth A. Shumaker**
**Clerk of Court**

<u>PUBLISH</u>

**UNITED STATES COURT OF APPEALS**

**TENTH CIRCUIT**

---

UNITED STATES OF AMERICA,

        Plaintiff–Appellee,

    v.

RESHARD BENARD,

        Defendant–Appellant.

No. 11-4005

---

**APPEAL FROM THE UNITED STATES DISTRICT COURT**
**FOR THE DISTRICT OF UTAH**
**(D.C. No. 09-CR-00056-DAK-DN-1)**

---

J. Edward Jones, Heber, Utah, for Defendant–Appellant.

Elizabethanne C. Stevens, Assistant United States Attorney (Carlie Christensen, United States Attorney, with her on the brief), Salt Lake City, Utah, for Plaintiff–Appellee.

---

Before **GORSUCH**, **HOLLOWAY,** and **McKAY**, Circuit Judges.

---

**McKAY**, Circuit Judge.

In this criminal appeal, Defendant Reshard Benard challenges the district court's denial of his motion to suppress evidence obtained during a vehicle stop on January 16, 2009. Following the denial of his suppression motion, Defendant entered a conditional plea of guilty to conspiracy to manufacture cocaine base and possession of a firearm as a convicted felon. He was then sentenced to a twenty-year sentence, the mandatory

minimum for his conspiracy charge.

## BACKGROUND

In 2008, the FBI began investigating an individual named Gessiel Sanchez, who was allegedly dealing drugs out of the tire store he managed in Salt Lake City, Utah. From December 16, 2008, until January 23, 2009, the FBI conducted an authorized wiretap on Mr. Sanchez's phone. Among those who frequently called Mr. Sanchez, the FBI identified one individual they dubbed "Tommy." Although Tommy and Mr. Sanchez never expressly mentioned drugs, the FBI concluded that Tommy was purchasing cocaine from Mr. Sanchez based on the context, including the per-ounce prices discussed and Tommy's complaint regarding the amount of product when "cooked up." Tommy also made a few phone calls in which he talked about purchasing tires, and in these phone calls he did not request products in ounces.

The intercepted phone calls suggested that Tommy purchased drugs from Mr. Sanchez on approximately ten occasions, with all or almost all of their meetings occurring at Mr. Sanchez's tire shop. Because the surveillance team was not always available, the FBI attempted surveillance of only five or so meetings between Tommy and Mr. Sanchez. On these occasions, the surveillance team observed Defendant arriving at the store and then leaving within about five minutes. Defendant was also observed purchasing tires from the store on one occasion. By checking the license plate number on Defendant's white Cadillac, FBI agents were able to determine Defendant's name. Agents from the surveillance team then confirmed that the photo on his driver's license matched the

-2-

person they had observed meeting with Mr. Sanchez following Tommy's phone calls. When they checked his records, the FBI also discovered that Defendant had previously been convicted of possessing a firearm in furtherance of a drug-trafficking offense.

On January 16, 2009, Tommy and Mr. Sanchez had a series of phone calls setting up a sale. In a phone call that morning, Tommy asked Mr. Sanchez what he could get for $1,300. Mr. Sanchez asked whether he wanted "1½ or 2." (R. vol. 2 at 26.) In reply, Tommy said he wanted 2½ and would "make it up to [Mr. Sanchez] later." (*Id.*) Based on previous phone calls establishing that Mr. Sanchez sold cocaine for approximately $650 per ounce, FBI agents concluded that Defendant was requesting Mr. Sanchez to sell him two ounces and front him an additional half ounce of cocaine. Around 1 pm, Mr. Sanchez called Tommy and told him "it's ready." (*Id.*) Tommy replied, "[G]ive me about 15 minutes." (*Id.*) At 2:02 pm, Mr. Sanchez called Tommy, who said he would be there in five minutes. Mr. Sanchez replied, "[Y]ou have three minutes." (*Id.*)

At "[a]pproximately 2 o'clock," agents from the surveillance team observed Defendant arriving at the tire store, where he stayed for about five minutes. (*Id.* at 36.) When he left, surveillance units followed him. One of the investigating officers then contacted a trooper from the Utah Highway Patrol and asked him to conduct a "wall stop" on Defendant's vehicle. In a wall stop, a patrol officer is asked to find his own lawful reason to stop and search the vehicle and is not advised of the information known by investigators in order to protect the secrecy of the ongoing investigation. In this case, the surveillance units informed the trooper of Defendant's movements and told him

-3-

Defendant was driving a white Cadillac with Utah license plate number A468RJ. The trooper was also informed of Defendant's history of weapons possession. The trooper then ran a check on Defendant's vehicle and received a message that no insurance was on file. Based on the apparent traffic violation of driving without insurance, the trooper initiated a traffic stop on the car, which pulled into a nearby residential driveway. Defendant immediately began getting out of the car, and the trooper told him to get back inside. After Defendant got back inside his vehicle, the trooper instructed him to show his hands, and Defendant complied. The trooper then approached Defendant's vehicle and instructed him to get out of the car. Defendant exited the car and approached the trooper, who briefly placed a hand on Defendant's back to guide him to the back of the car. Defendant's friends came out of the nearby residence to see what was happening, and the trooper instructed them to return inside. They complied.

The trooper then asked Defendant if he could pat him down, and Defendant agreed. While patting down Defendant's left pocket, the trooper felt something and asked if he could take it out. Defendant agreed to let the trooper remove it, telling him it was Mexican candy. This item was later found to contain cocaine. After removing the purported candy, the trooper patted down Defendant's right pocket and again found something he could not identify. When asked, Defendant told the officer that this item was weed, and he allowed the trooper to remove the item. The trooper saw that the item indeed appeared to be marijuana, and he accordingly handcuffed Defendant and took him into custody. The trooper then asked what else he might find in the car, and Defendant

-4-

said there might be a gun left by his girlfriend. An officer who searched the car at the scene found a loaded gun inside the vehicle. At no point during the encounter was Defendant advised of his *Miranda* rights. *See Miranda v. Arizona*, 384 U.S. 436 (1966).

Following his indictment, Defendant filed a motion to suppress all of the evidence obtained as a result of the traffic stop. In addition to challenging the legality of the traffic stop as a whole, he also challenged the validity of his consent to the pat-down search and the admissibility of his un-Mirandized statements. The matter was referred to a magistrate judge, who held an evidentiary hearing and recommended that the motion to suppress be denied in full. The magistrate judge concluded that the traffic stop could be justified on either of two alternative grounds—(1) probable cause to believe the vehicle contained contraband, or (2) reasonable suspicion that Defendant was operating the vehicle without insurance. The magistrate judge further concluded that the pat-down search was consensual and that Defendant's statements did not need to be suppressed under *Miranda*. The magistrate judge's findings and conclusions were adopted by the district court, which accordingly denied Defendant's suppression motion. Defendant then entered a conditional guilty plea and was sentenced to twenty years' imprisonment. This appeal followed.

## DISCUSSION

In reviewing the denial of a defendant's motion to suppress, we view the evidence in the light most favorable to the government, accept the district court's findings of fact and credibility determinations unless clearly erroneous, and review de novo the ultimate

question of reasonableness under the Fourth Amendment. *United States v. Vazquez*, 555 F.3d 923, 927 (10th Cir. 2009). On appeal, Defendant challenges the denial of his suppression motion as it related to (1) the traffic stop itself; (2) the pat-down search; and (3) the failure to give *Miranda* warnings.

We first consider the district court's conclusion that the traffic stop was supported by probable cause. Under the automobile exception to the warrant requirement, police officers may stop and search a car if they have probable cause to believe it contains contraband, regardless of whether a traffic violation has occurred or a search warrant has been obtained. *See United States v. Chavez*, 534 F.3d 1338, 1343-45 (10th Cir. 2008). "Probable cause to search a vehicle is established if, under the totality of the circumstances, there is a fair probability that the car contains contraband or evidence." *Id.* at 1344 (quotation marks omitted). Under the collective knowledge doctrine, the officer who conducts the vehicle search does not need to be aware of the facts establishing probable cause, so long as he is acting on instructions delivered by an officer who has probable cause. *See id.* at 1345-47. Defendant does not dispute that the trooper who conducted the traffic stop would have probable cause under the collective knowledge doctrine if the FBI agents had probable cause. He simply argues that probable cause was lacking because there was insufficient evidence to tie him to any drug trafficking at the tire store.

In essence, the parties' arguments on this issue boil down to one question—did the investigating officers have probable cause to believe Defendant was the drug buyer they

had designated as "Tommy"?  Defendant argues that "the fact that his appearance at a tire store sometimes coincided with tapped phone calls" is insufficient to establish probable cause (Appellant's Opening Br. at 19), especially since the surveillance team observed him actually purchasing tires from the tire store and installing them on his vehicle. However, although the officers may not have had air-tight proof that Defendant was Tommy, we conclude that the facts were sufficient to establish probable cause.  There were around five occasions where surveillance was conducted on the tire store after Tommy set up meetings with Mr. Sanchez, and on these occasions Defendant was seen arriving at the tire store and leaving a few minutes later.  The fact the surveillance team observed Defendant purchasing tires at the store on one occasion did not diminish the likelihood that he was Tommy, especially since Tommy's phone calls with Mr. Sanchez included discussions of tire purchases as well as drugs.  On January 16, 2009, Tommy and Mr. Sanchez arranged a cocaine purchase, and Defendant showed up at the tire store during the expected buy time.  The totality of the circumstances established a fair probability that Defendant's car contained contraband when he drove away from the tire store after this visit, and we therefore hold that the stop and search of Defendant's vehicle was permitted under the automobile exception.

Because we affirm the stop on this basis, we need not consider the district court's alternative holding that the stop was justified based on the trooper's reasonable suspicion the vehicle was being operated without insurance.  We also need not consider Defendant's argument that the vehicle stop and search unlawfully exceeded the scope of

an insurance verification check: the search of Defendant's vehicle for contraband was permitted under the automobile exception, and the trooper's use of a cover story to mask the true basis for the stop was a valid law enforcement tactic. *See Chavez*, 534 F.3d at 1348.

We thus turn to Defendant's next argument—that his consent to the pat-down search was coerced and therefore invalid. In *United States v. Sanchez*, 89 F.3d 715, 718 (10th Cir. 1996), we identified "several factors that could lead a reasonable innocent person to believe that he is not free to disregard the police officer." These factors include:

> the threatening presence of several officers; the brandishing of a weapon by an officer; some physical touching by an officer; use of aggressive language or tone of voice indicating that compliance with an officer's request is compulsory; prolonged retention of a person's personal effects such as identification and plane or bus tickets; a request to accompany the officer to the station; interaction in a nonpublic place or a small, enclosed space; and absence of other members of the public.

*Id.* Defendant argues that certain of these factors weigh against a finding of voluntary consent in this case, since more than one officer was present and the trooper who conducted the search physically touched Defendant, spoke with an authoritative tone of voice, and ordered Defendant's friends to go back inside their residence. However, we review the district court's finding of voluntary consent only for clear error, *see United States v. Cruz-Mendez*, 467 F.3d 1260, 1265 (10th Cir. 2006), and we are not persuaded the court's ruling was clearly erroneous. Only two police officers were present at the scene, and only one of these officers approached Defendant. Neither officer drew a

weapon or otherwise acted in a threatening manner. The videotape of the traffic stop shows that the physical contact between the trooper and Defendant was brief and was not forceful or aggressive. The trooper's tone of voice, although authoritative, was never aggressive or threatening. Moreover, although Defendant's friends complied with the order to return into their house, they—along with other members of the public—were still able to observe the interaction, which occurred on a public street in broad daylight. Under the totality of the circumstances, we are not persuaded the district court clearly erred in finding that Defendant voluntarily consented to the pat-down search.

We next turn to Defendant's argument that the statements he made both during and after the pat-down search should have been suppressed under *Miranda*. "It is well established that police officers are not required to administer *Miranda* warnings to everyone whom they question. Instead, *Miranda* only applies when an individual is subject to custodial interrogation." *United States v. Hudson*, 210 F.3d 1184, 1190 (10th Cir. 2000) (quotation marks and citations omitted). "Thus two requirements must be met before *Miranda* is applicable; the suspect must be in 'custody,' and the questioning must meet the legal definition of 'interrogation.'" *United States v. Perdue*, 8 F.3d 1455, 1463 (10th Cir. 1993). As for the first requirement, "a person is not in custody for *Miranda* purposes unless his 'freedom of action is curtailed to a degree associated with formal arrest.'" *Hudson*, 210 F.3d at 1190 (quoting *Berkemer v. McCarty*, 468 U.S. 420, 440 (1984)). As for the second requirement, "[t]he Court has explained that interrogation includes 'any words or actions on the part of the police . . . that the police should know

are reasonably likely to elicit an incriminating response from the suspect.'" *Perdue*, 8 F.3d at 1464 (quoting *Rhode Island v. Innis*, 446 U.S. 291, 301 (1980) (alteration in original)).

Traffic stops do not usually implicate *Miranda* concerns, since a traffic stop is typically noncoercive and nonthreatening. *See id.* at 1464-65. "In *Perdue*, we recognized a limited exception to this general rule, holding police officers must advise suspects of their constitutional rights, even in the context of a *Terry* stop, 'if they . . . take highly intrusive steps to protect themselves from danger.'" *United States v. Eckhart*, 569 F.3d 1263, 1276 (10th Cir. 2009) (quoting *Perdue*, 8 F.3d at 1465) (alteration in original). We found this exception to apply in *Perdue* because the police forced the defendant out of his car and onto the ground at gunpoint, then questioned him with their guns drawn on him and his pregnant fiancee as police helicopters hovered above. *Perdue*, 8 F.3d at 1464. Under these circumstances, we held, the defendant was in police custody because any person in his position would have felt completely at the mercy of the police. *Id.* at 1465.

We are not persuaded the *Perdue* exception applies in this case. The trooper's orders for Defendant to show his hands and leave the car did not involve a level of force or command consistent with a formal arrest. Indeed, these actions are a permissible part of a routine traffic stop. *See United States v. Holt*, 264 F.3d 1215, 1223 (10th Cir. 2001) (en banc). The situation was a far cry from the intense, police-dominated atmosphere of *Perdue*. *See Perdue*, 8 F.3d at 1464-65; *see also Eckhart*, 569 F.3d at 1276. We conclude that Defendant was not in custody for *Miranda* purposes until he was

handcuffed and formally placed in custody after the trooper discovered marijuana in his pocket. Thus, the district court did not err in denying Defendant's motion to suppress the statements he made during the pat-down search.

On the other hand, we conclude that the district court erred in failing to suppress Defendant's post-arrest statements, particularly his statement that his girlfriend might have left a gun in his car. The district court concluded that, although Defendant was in custody at the time this statement was made, he was not subjected to interrogation. The court reasoned that the trooper's question about what he would find in the vehicle was based on safety concerns and was not reasonably likely to elicit an incriminating response. However, as the government concedes on appeal, the public safety exception was inapplicable. We have held that *Miranda* warnings are not required for an officer to ask a suspect if he has any guns or sharp objects, so long as the officer has "reason to believe (1) that the defendant might have (or recently have had) a weapon, and (2) that someone other than police might gain access to that weapon and inflict harm with it." *United States v. DeJear*, 552 F.3d 1196, 1201 (10th Cir. 2009) (quotation marks omitted). In this case, the government has not shown that the trooper had reason to believe someone other than the police might gain access to any weapons in Defendant's car. Defendant had already left the car and been taken into custody, and the police had control of the scene and intended to impound the vehicle. The trooper's question was "reasonably likely to elicit an incriminating response from the suspect," *Innis*, 446 U.S. at 301, and

-11-

was not justified by the public safety exception.[1]  We therefore hold that the district court erred in denying the motion to suppress Defendant's post-arrest statements.

Having so held, we must next consider whether the district court's failure to suppress this evidence entitles Defendant to withdraw his conditional guilty plea under Rule 11(a)(2) of the Federal Rules of Criminal Procedure, which permits a "defendant who prevails on appeal" to withdraw his plea.  The government argues that Defendant has not prevailed on appeal because he has not succeeded in suppressing the most damaging evidence against him.  The government contends that the district court's suppression error was harmless because (1) evidence of the gun itself was still admissible and (2) Defendant's sentence was determined by the mandatory minimum for the drug count and was not affected by his firearm conviction.

"The burden is on the government to prove beyond a reasonable doubt that an error is harmless."  *United States v. Miller*, 111 F.3d 747, 751 (10th Cir. 1997).  However, as several other jurisdictions have noted, the government will very rarely be able to make this showing in the context of a conditional plea of guilty where the trial court erroneously fails to suppress evidence relating to one or more of the counts of conviction.  *See Glenn v. Commonwealth*, 633 S.E.2d 205, 218-20 (Va. Ct. App. 2006), *vacated en banc on other grounds*, 642 S.E.2d 282 (Va. Ct. App. 2007) (collecting cases).  In cases

---

[1] Moreover, the trooper's question was broadly framed and was not focused on possible safety concerns.  For this reason as well, we conclude that *Miranda* warnings were required.

that are decided by a jury, a court will only find a constitutional error harmless if the court

can conclude "beyond a reasonable doubt that the error complained of did not contribute

to the verdict obtained." *Chapman v. California*, 386 U.S. 18, 24 (1967).  In convictions

based on guilty pleas, the test "must at least be reformulated to determine whether there is

a reasonable possibility that the error contributed to the plea." *People v. Grant*, 380

N.E.2d 257, 264 (N.Y. 1978).  However, in the context of a plea, the record will be

unlikely to contain enough information for an appellate court to reach this conclusion

beyond a reasonable doubt.  *See id.*  "Unlike a verdict, which must necessarily be based

exclusively on the evidence submitted at trial, a defendant's decision to plead guilty may

be based on any factor inside or outside the record."  *Id.*  Thus, "only the defendant is in a

position to evaluate 'the impact of a particular erroneous refusal to suppress evidence.'"

*Jones v. Wisconsin*, 562 F.2d 440, 445 (7th Cir. 1977) (quoting *People v. Hill*, 528 P.2d 1,

29 (Cal. 1974), *overruled on other grounds by People v. DeVaughn*, 558 P.2d 872, 875

(Cal. 1977)).  Accordingly,"an appellate court will rarely, if ever, be able to determine

whether an erroneous denial of a motion to suppress contributed to the defendant's

decision [to plead guilty], unless at the time of the plea he states or reveals his reason for

pleading guilty." *Grant*, 380 N.E.2d at 265.

> As the California Supreme Court has explained:
>
> There simply is no intelligent means of assessing the impact of a particular
> erroneous refusal to suppress evidence.  Unlike the ordinary post-trial
> appeal, there is nothing at all in the record to indicate what evidence or
> defenses the defendant is capable of producing on his own behalf. . . .  After
> the exclusion of certain items of evidence, the prosecution's case may

continue to appear invulnerable to an appellate court which necessarily can look only to the strength of competent evidence indicative of the accused's guilt. However, the defendant may have or believe he has means of impeaching, discrediting or casting doubt on such evidence, and the items excluded on appeal might be the very ones which posed the most difficult strategic problems for the defendant. . . . We cannot, with any assurance, conclude that an appellate court, which does not have the benefit of that knowledge, can consistently arrive at an accurate assessment of whether the defendant would again plead guilty after knowledge that some but not all of the challenged evidence is to be suppressed. To the contrary, an unacceptable degree of appellate speculation would necessarily inject itself into the application of the harmless error concept in such a context.

*Hill*, 528 P.2d at 29.

Like the First Circuit, we find the California Supreme Court's opinion in *Hill* and the New York Court of Appeals' opinion in *Grant* to be well-considered and persuasive. *See United States v. Weber*, 668 F.2d 552, 562 (1st Cir. 1981) (holding that the district court's erroneous failure to suppress evidence was not harmless even though the admissible evidence against the defendants was so strong that, "[h]ad this appeal followed a trial in the ordinary manner and had this [evidence] been improperly admitted," the improper evidence "might possibly have been found merely cumulative and non-prejudicial"). On the basis of the record before us, we cannot conclude beyond a reasonable doubt that the district court's error did not contribute to Defendant's decision to plead guilty. The record does not indicate why Defendant decided to plead guilty, what other defenses or evidence he might have produced on his behalf, or how the altered bargaining positions of the parties might have affected his decision if his post-arrest statements had been properly suppressed. As for the government's argument that the

-14-

court's suppression error was harmless because the firearm conviction had no effect on Defendant's sentence, the relevant question for harmless error in this context is whether the error contributed to the plea, not whether it contributed to the sentence. The fact that Defendant's sentence was not ultimately affected by the firearm conviction does not prove beyond a reasonable doubt that Defendant would have made the same decision to waive his constitutional rights to trial if the district court had not erroneously denied his motion to suppress some of the evidence against him.

Nor are we persuaded by the government's argument that any remand of this case should be limited to the firearm conviction because Defendant's post-arrest statements did not implicate his drug conviction. This argument "ignores the fact that the guilty plea was entered as part of an agreement involving all of the counts of the [indictment]." *People v. Miller*, 658 P.2d 1320, 1326 (Cal. 1983). Defendant's decision to plead guilty to the drug count was not made in a vacuum independent of the evidence on the firearm count. "The bargaining positions of the parties were determined, in part, by the aggregate strength of all the incriminating evidence accumulated by the [government]." *Id.* at 1325-26. As the California Supreme Court reasoned in *Miller*, a defendant who enters a conditional plea to a multi-count indictment "undoubtedly negotiated for what he believed was the best disposition that he could obtain given the trial court's denial of his suppression motion. This objective may well have led him to plead guilty to 'untainted' as well as 'tainted' counts." *Id.* at 1326. Thus, finding the suppression error to affect only some counts of a multi-count indictment would interfere with the defendant's

"prerogative to *personally* decide whether to stand trial or to waive his rights by pleading guilty" to the various counts of the indictment. *Hill*, 528 P.2d at 29. We cannot conclude beyond a reasonable doubt that Defendant would still have agreed to waive his right to a jury trial as to either or both of the counts of conviction absent the district court's error. *See Miller*, 658 P.2d at 1326. We therefore hold that the district court's suppression error requires remand of both counts of conviction under Rule 11(a)(2).

In so ruling, we note that, should Defendant choose to withdraw his plea on remand, the parties will be restored to the status quo ante except as to the improperly admitted evidence. *See Miller*, 658 P.2d at 1327. The government will accordingly be free to reinstate any of the charges against Defendant that were dismissed pursuant to the plea agreement, *see United States v. Bunner*, 134 F.3d 1000, 1005 (10th Cir. 1998), and Defendant may not receive the same sentence if he is convicted following a jury trial. Thus, while Defendant is entitled to withdraw his guilty plea on remand, he may instead choose to be bound by the original plea if he concludes that this course of action would be strategically preferable in light of his limited success on appeal. *See Hill*, 528 P.2d at 30.

## CONCLUSION

The district court's order denying Defendant's suppression motion is **REVERSED** as to Defendant's post-arrest statements but otherwise **AFFIRMED**. Defendant's convictions and sentence are **REVERSED** and **REMANDED**. On remand, Defendant should decide whether he wishes to withdraw his plea under Rule 11(a)(2). If Defendant

-16-

elects not to withdraw his guilty plea, the district court is directed to reinstate his convictions and sentence.

11-4005, *United States v. Benard*

**GORSUCH, J.**, concurring in part and dissenting in part.

I concur a great deal more than I dissent. My colleagues hold the traffic stop lawful, the pat-down consensual, and Mr. Benard's pre-arrest statements admissible. With all this, I agree. I agree, too, that Mr. Benard's post-arrest statement was erroneously admitted and that we must decide whether that error was or was not harmless. And I agree that, for a constitutional error like this one to qualify as harmless, it's incumbent on the government to prove beyond a reasonable doubt that the admission of Mr. Benard's post-arrest statements would've made no difference to his plea calculation. *See Chapman v. California*, 386 U.S. 18, 24 (1967); *United States v. Miller*, 111 F.3d 747, 751 (10th Cir. 1997).

My concerns arise only when the court ventures beyond these holdings. On pages 12-14, the court speculates that the government will "very rarely be able to make [the harmless error] showing" in the context of a conditional plea, citing for support state cases that categorically refuse to apply harmless error analysis in this arena. The court's commentary here is dicta because neither Mr. Benard nor the government suggests any difficulty with the application of harmless error analysis in this case or discusses any of the arguments or authorities the court examines. *See Headrick v. Rockwell Int'l Corp.*, 24 F.3d 1272, 1277-78 (10th Cir. 1994) (White, J.) (failure to press an argument for reversal waives it). Neither does the court's speculative aside matter to its ultimate holding on pages 14-15, where it returns to and applies traditional harmless error analysis.

I mention this only because the court's detour along the way to its holding raises important issues this court will have to resolve in another case another day. The court cites favorably state court decisions holding harmless error analysis inapplicable to the conditional guilty plea context because of the epistemological challenges associated with reconstructing whether a particular defendant would have pleaded guilty but for an antecedent legal error. *See, e.g.*, *People v. Hill*, 528 P.2d 1, 29 (Cal. 1974). And on first encounter this line of thinking seems appealing enough. But unmentioned is the fact that these state decisions didn't — and didn't have to — grapple with the Federal Rules of Criminal Procedure and their command in Rule 52(a) that harmless error analysis applies to all non-structural errors in federal proceedings. Or the fact that the Supreme Court has repeatedly told us that Rule 52(a) must be respected in federal proceedings. *See, e.g.*, *United States v. Dominguez Benitez*, 542 U.S. 74, 81 (2004). Or the fact that the Supreme Court has even more specifically directed us to apply harmless error analysis when a district court fails to inform a defendant of all his legal rights before accepting his guilty plea — a circumstance sharing the very same sort of epistemological challenges as this case. *See id.* at 83 (tasking federal appellate courts with deciding whether "but for the error, [the defendant] would not have entered the plea"). Unmentioned as well is the tool federal courts traditionally use to resolve doubts about the defendant's likely conduct in an error-free but-for world: the burden of proof. By allocating to the government the burden of proving harmlessness, any difficulties in reconstructing an alternate error-free world are resolved in favor of the defendant. *See* 2 Kenneth S. Broun, McCormick On

-2-

Evidence § 337 (6th ed. 2009) ("The risk of failure of proof may be placed upon the party who contends that the more unusual event has occurred."); *United States v. Olano*, 507 U.S. 725, 734-35 (1993) (explaining Rule 52's allocation of burdens). Whether and to what extent the state authorities cited by the majority have anything useful to tell us in light of these considerations at play in federal practice are issues for another day and case, when the parties raise and have a chance to be heard on them and they make a difference to the outcome.

Finally, I must also respectfully dissent from the court's harmless error holding. To be sure, the court eventually returns to and applies the traditional federal harmless error test (on pages 14-15). But when it does so, the court tells us that the government hasn't met its burden without telling us why. And it's difficult to understand why. To be sure, after arresting Mr. Benard, a police officer asked him whether he would find anything in his car. Mr. Benard answered that his girlfriend sometimes kept a gun there. And that erroneously admitted statement, Mr. Benard argues, strengthened the government's hand on the felon in possession charge and induced him to plead guilty.

But at least two serious problems attend this theory. First, Mr. Benard does not dispute that the government had ample other admissible evidence to prove the gun charge against him: everyone agrees the gun would have been found pursuant to a lawful inventory search regardless of Mr. Benard's statements; the gun was located in a vehicle over which Mr. Benard had exclusive control; and Mr. Benard's girlfriend gave a statement suggesting the gun was his. Second, and making matters even worse for Mr.

Benard, the gun charge had no effect on the potential sentence he faced. When deciding whether to plead guilty, he already faced a 20 year mandatory minimum sentence thanks to the separate drug charges against him. And his advisory guidelines sentence range was even higher than that, thanks to a career offender enhancement. The gun charge had no impact — one way or the other — on any of this. (And, in the end of course, the district court varied downward from the guidelines range to the 20 year mandatory minimum.)

For its part, then, the government has advanced two powerful reasons for thinking that the suppression error here was harmless — that it would have had no effect on Mr. Benard's calculation whether to plead guilty or proceed to trial. In reply, Mr. Benard offers us nothing on the other side of the equation. He rejoins with no reason — rational or even irrational — why the admission of his post-arrest statements were at all relevant to him in making his plea decision. To be sure, his brief argues at length and in detail how and why various *other* alleged district court errors *did* matter to his plea decision (for example, the admission of pre-arrest statements). But my colleagues and I reject all those other claims of error. On the sole error we do find, Mr. Benard has identified no reason to think it made any difference. Perhaps in another case to another defendant an error like this might have mattered. But in this case, on the evidence and argument before us, the government has met its high burden of showing harmless error and I would affirm.