**UNITED STATES COURT OF APPEALS**

**TENTH CIRCUIT**

**UNITED STATES OF AMERICA.**

Plaintiff - Appellee,

v.

**ERNESTO HERNANDEZ-LIZARDI,**

Defendant - Appellant.

No. 11-3236
(D.C. No. 6:10-CR-10136-EFM-1)
(D. Kan.)

---

**ORDER AND JUDGMENT**[*]

---

Before **O'BRIEN**, **TYMKOVICH**, and **MATHESON**, Circuit Judges.

Ernesto Hernandez-Lizardi appeals from his conviction for being an unlawful

alien in possession of firearms and ammunition in violation of 18 U.S.C. § 922(g)(5).  He

contends his motion to suppress evidence from an encounter with Kansas Highway Patrol

(KHP) troopers should have been granted.  The encounter began as a traffic stop, but

expanded into extended roadside questioning and a cursory roadside search of his pickup.

---

[*] This order and judgment is an unpublished decision, not binding precedent. 10th
Cir. R. 32.1(A).  Citation to unpublished decisions is not prohibited.  Fed. R. App. 32.1.
It is appropriate as it relates to law of the case, issue preclusion and claim preclusion.
Unpublished decisions may also be cited for their persuasive value.  10th Cir. R. 32.1(A).
Citation to an order and judgment must be accompanied by an appropriate parenthetical
notation – (unpublished).  *Id.*

When the search uncovered a large sum of cash, troopers escorted him to a KHP office for further interrogation in which he admitted to being illegally in the United States. Concurrent with the questioning, troopers further searched the pickup and discovered firearms and ammunition.

The district judge correctly concluded the searches and seizures were reasonable because they were appropriately justified at each stage. He also correctly concluded the evidence was sufficient to support Hernandez-Lizardi's conviction. We affirm.

## BACKGROUND

Because each phase of the encounter between Hernandez-Lizardi and KHP troopers must be reasonable under the Fourth Amendment, we divide our recitation of the factual background into three stages: (A) the initial traffic stop; (B) the continuation of the traffic stop after issuing a speeding ticket; and (C) the seizure of Hernandez-Lizardi's cash and his escort to the KHP office.

### A. Initial Traffic Stop

On August 15, 2010, KHP Trooper Shawn Summers clocked Hernandez-Lizardi's pickup at 83 miles-per-hour in a 70 miles-per-hour zone.[1] Summers initiated a traffic stop. He approached the pickup, which displayed a Missouri dealer's license plate, and asked Hernandez-Lizardi for his driver's license and proof of insurance. Summers also asked the pickup's passenger, Raul Manzanarez-Rivera, for identification. Hernandez-

---

[1] As Summers pulled the pickup over, his videotape recorder automatically activated.

Lizardi tendered a California driver's license with an Anaheim, California address. Manzanarez-Rivera, avoiding eye contact, produced a Mexican identification card.

In response to Summers's request for proof of insurance, Hernandez-Lizardi explained he had recently purchased the truck in Kansas City, Missouri, and did not have proof of insurance. He gave Summers a bill of sale, showing his residential address as Prospect Avenue in Kansas City, Missouri, not Anaheim, California. From experience, Summers knew Prospect Avenue to be an area of Kansas City known for criminal activity. Moreover, Summers noticed the bill of sale stated an implausibly low $1,000 sale price for the pickup. Summers also noticed three cell phones in the pickup's center console.

Summers asked the men where they were traveling. Hernandez-Lizardi said he had been in Kansas City visiting friends for two weeks. He was taking Manzanarez-Rivera to Denver to fix a friend's vehicle, after which he would take Manzanarez-Rivera back to Kansas City before returning to his home in California.

Summers's record check revealed Hernandez-Lizardi's license to be valid and did not reveal any warrants for his arrest. The record check also returned no information on the pickup; usually the case when vehicles bear a Missouri dealer's license plate, Summers explained. Summers returned to the pickup, gave Hernandez-Lizardi a citation, and said: "That's all I have for ya. Have a safe trip, okay?" (R. Vol. 1 at 133.)

## B. Continuation of Traffic Stop

Troubled by the implausibility of the details on the bill of sale and Hernandez-Lizardi's travel plans, Summers turned around and told Hernandez-Lizardi he had a "couple of questions to ask." (R. Vol. 1 at 133.) Summers again questioned the men's

travel plans.  He also asked if they had any drugs, guns, or cash; the men said no.  (R. Vol. 1 at 234.)  Summers then asked if he could take a "quick look" inside the truck cab. (R. Vol. 1 at 133.)  The men agreed.  For his safety, Summers asked both occupants to exit the pickup.  He inquired again if there was money in the truck; Hernandez-Lizardi said "No, no money in truck."  (R. Vol. 1 at 133.)

Summers then patted both occupants down for weapons and instructed them to stand in front of the pickup.  As Summers walked back to the pickup to inspect the cab, Hernandez-Lizardi volunteered: "I do have some money in the truck."  (R. Vol. 1 at 134.) When Summers asked where the money was, Hernandez-Lizardi retrieved a small purse from the center console.  It contained cash bundled in denominations with colored rubber bands.  When Summers asked him how much money there was, Hernandez-Lizardi did not know exactly, but stated he thought he had about $20,000.  Summers inquired why Hernandez-Lizardi had not told him about the money.  Hernandez-Lizardi answered: "well, I don't know, I forgot about it" and explained that his sister had given him the cash to buy a car for her.  (R. Vol. 1 at 134.)

At the evidentiary hearing on Hernandez-Lizardi's motion to suppress, KHP Trooper John D. ("Doug") Rule (who later interviewed Hernandez-Lizardi) explained bundling is consistent with how drug traffickers handle their cash.  Moreover, Hernandez-Lizardi's estimate of the amount of cash was incorrect; when investigators later counted the cash, they found only $14,400.

### C.  Seizure of Cash and Escort to KHP Offices

When Summers discovered the cash, he requested backup; two additional KHP troopers soon arrived in separate cars.  Summers also called Trooper Rule, who was

- 4 -

assigned to the Drug Enforcement Administration Task Force in Hays, Kansas.  Rule instructed the troopers to secure the cash and to bring the men to the nearby KHP office in Hays so he could talk with them.  Summers told Hernandez-Lizardi and Manzanarez-Rivera that a person at the KHP office wanted to talk to them about the money and instructed Hernandez-Lizardi to follow him there.  The men returned to the pickup and followed Summers—who retained the cash—to the KHP office in Hays (approximately twelve miles away).  Another trooper driving a patrol car followed the pickup.

At the KHP office, Rule interviewed Hernandez-Lizardi, who said he had taken the bus from California to Kansas City and had purchased his pickup truck in Kansas City for $16,000 less than a month ago.  He repeated his earlier statement: the money belonged to his sister, who wanted him to use it to buy a car for her.  He also volunteered that he and his sister were Mexican citizens and unlawfully in the United States.

While Rule interviewed Hernandez-Lizardi, Summers began to search the pickup more thoroughly.  He found a box containing rifle and pistol ammunition on the back floorboard.  Further searching revealed an SKS assault rifle wrapped in a towel behind the rear seat of the cab as well as two loaded handguns in the speaker enclosures in the back-seat area of the cab.  A drug-sniffing dog also alerted to the odor of narcotics on the seized cash.

## PROCEDURAL HISTORY

Hernandez-Lizardi was indicted for possession of a firearm and ammunition by an alien unlawfully present in the United States (or unlawful alien) in violation of 18 U.S.C. § 922(g)(5).  Following an evidentiary hearing, the judge denied Hernandez-Lizardi's motion to suppress the guns and ammunition.  Hernandez-Lizardi proceeded to trial.  He

- 5 -

was convicted and later sentenced to 33 months incarceration.  His motion for judgment of acquittal was denied.

## DISCUSSION

Hernandez-Lizardi contends: (1) his motion to suppress should have been granted and (2) the evidence was insufficient to sustain his conviction.  We see no error.

### I.  Fourth Amendment Issues

The suppression motion has three prongs: (A) Summers lacked justification to continue the traffic stop after issuing the speeding ticket; (B) Summers's roadside search of the pickup was unjustified; and (C) the troopers lacked justification for seizing and transporting Hernandez-Lizardi to the KHP office, interviewing him at the office, and performing the second search of the vehicle.  But each phase of Hernandez-Lizardi's encounter with the troopers was justified under the applicable Fourth Amendment standard.

The standard of review in suppression cases is abundantly clear.  "[W]e view the evidence in the light most favorable to the government, accept the district court's findings of fact and credibility determinations unless clearly erroneous, and review de novo the ultimate question of reasonableness under the Fourth Amendment." *United States v. Benard*, 680 F.3d 1206, 1209-10 (10th Cir. 2012); *see Ornelas v. United States*, 517 U.S. 690, 699 (1996).

### A. Extended Investigatory Detention

Did Summers have reasonable suspicion to continue his roadside investigatory detention after citing Hernandez-Lizardi for speeding?[2]  Certainly.

We review a traffic stop as an investigatory detention rather than a custodial arrest. *United States v. McGehee*, 672 F.3d 860, 866 (10th Cir. 2012).  Usually, "once an officer returns the driver's license and vehicle registration and issues a warning ticket, he must allow the driver to proceed without further detention or questioning."  *United States v. Lyons*, 510 F.3d 1225, 1237 (10th Cir. 2007).  However, an officer may continue a traffic stop beyond its original justification, if, during the course of the detention, the officer develops a reasonable suspicion of further criminal activity.  *McGehee*, 672 F.3d at 867; *Lyons*, 510 F.3d at 1237.  "Reasonable suspicion" refers to "'a particularized and objective basis' for suspecting the person stopped of criminal activity."  *Ornelas*, 517 U.S. at 696 (quoting *United States v. Cortez*, 449 U.S. 411, 417-18 (1981)).  This means the officer must have some more objective justification for the detention than "[i]nchoate suspicions and unparticularized hunches."  *United States v. Simpson*, 609 F.3d 1140, 1147 (10th Cir. 2010) (quotations omitted).  Nevertheless, we defer "to an officer's ability to distinguish between innocent and suspicious actions" so long as the officer can cite "specific, articulable facts" which cannot "be outrightly dismissed as so innocent or susceptible to varying interpretations as to be innocuous."  *Simpson*, 609 F.3d at 1146-47 (quotations omitted).

Here, as the district judge found, there were specific, articulable facts to support the extended detention.  At the time Summers re-initiated his contact with Hernandez-

---

[2] The judge concluded the continuation of the traffic stop was also permissible because Hernandez-Lizardi consented to the continuation of the detention.  We need not determine whether the continued detention was permissible under this alternative rationale.

Lizardi (after having returned his papers and telling him to have a safe trip), Summers knew: (1) Hernandez-Lizardi was using a dealer's tag even though he claimed to have purchased the pickup; (2) there were three mobile phones in the vehicle, but only two passengers;[3] (3) the bill of sale stated an implausible $1,000 purchase price for a 2003 Chevrolet extended-cab pickup; (4) the bill of sale showed Hernandez-Lizardi lived at an address in Kansas City, Missouri, not in Anaheim, California, as Hernandez-Lizardi and his driver's license stated; and (5) Manzanarez-Rivera exhibited a nervous demeanor by avoiding eye contact.[4] Moreover, Hernandez-Lizardi's travel plans were, to use the district judge's characterization, "bizarre." (R. Vol. I at 176.) According to his plan, he had driven approximately 1600 miles from Anaheim, California, to Kansas City, Missouri, to pick up Manzanarez-Rivera, planned a 1200-mile round-trip to Denver to repair a friend's car, and then intended to make the 1600-mile return trip to Anaheim.[5]

---

[3] As law enforcement officers know, mobile phones are a "recognized tool of the trade in drug dealing." *See United States v. Slater*, 971 F.2d 626, 637 (10th Cir. 1992). Although mobile phones may not be as strongly associated with the drug trade as they once were, the presence of more phones than passengers, particularly when combined with the other specific facts suggesting Hernandez-Lizardi was involved with drug dealing, cannot be "dismissed as so innocent . . . as to be innocuous." *See Simpson*, 609 F.3d at 1147 (quotations omitted).

[4] As we have explained, "nervousness is a common, natural reaction during a traffic stop, and thus only extraordinary and prolonged nervousness can weigh significantly in the assessment of reasonable suspicion." *United States v. Davis*, 636 F.3d 1281, 1291 (10th Cir. 2011) (quotations omitted). Nevertheless, nervousness may still "contribute marginally to a reasonable suspicion of illegal activity" when there are other factors supporting the officer's suspicion. *See id.*

[5] *See, e.g., Simpson*, 609 F.3d at 1148 (10th Cir. 2010) ("'Implausible travel plans can contribute to reasonable suspicion.'") (quoting *United States v. Santos*, 403 F.3d 1120, 1129 (10th Cir. 2005)); *United States v. White*, 584 F.3d 935, 951 (10th Cir. 2009) ("We have noted numerous times that implausible travel plans can form a basis for reasonable suspicion.") (quotations omitted).

Any of these facts, taken individually, may have been insufficient to raise a reasonable suspicion. Collectively, they provided ample reason to suspect Hernandez-Lizardi's story was a fabrication to cover up illegal activity. *See Lyons*, 510 F.3d at 1237 (noting we consider the factors known to the investigating officer "in their totality"). This reasonable suspicion rendered Summers's extended investigative detention reasonable under the Fourth Amendment. *See McGehee*, 672 F.3d at 867.

### B. Roadside Search of Truck

Hernandez-Lizardi next claims he did not consent to Trooper Summers's cursory roadside search of his pickup. Rather, in his view, he merely "acquiesce[ed] to the trooper's authority." (Appellant's Br. at 24.) We think not.

The voluntariness of a defendant's consent to search is "a question of fact determined by the totality of the circumstances," *Lyons*, 510 F.3d at 1239, and our review is for clear error. *United States v. Davis*, 636 F.3d 1281, 1292 (10th Cir. 2011). The government bears the burden of demonstrating voluntariness by showing the consent was unequivocal and non-coerced. *Id.* Although we may consider whether the defendant was in the custody of law enforcement officers at the time of consent, the mere fact of custody does not undermine the voluntariness of the consent. *United States v. Watson*, 423 U.S. 411, 424 (1976); *Davis*, 636 F.3d at 1293 ("[A]n individual may voluntarily consent to a search even though he is detained."). Custody is merely one factor in assessing whether law enforcement officers undermined the defendant's ability to make a "free and unconstrained choice," *Watson*, 423 U.S. at 424 (quotations omitted), through "physical mistreatment, use of violence or threats of violence, promises or inducements,

- 9 -

deception, or trickery." *United States v. Glover*, 104 F.3d 1570, 1584 (10th Cir. 1997), *overruled on other grounds by Corley v. United States*, 556 U.S. 303 (2009).[6]

Here, Summers did not use physical mistreatment, violence, promises, inducements, deception, or trickery to coerce Hernandez-Lizardi into consenting to the search of his pickup. During the extended investigatory detention, Summers asked whether he could take a "quick look" inside the truck. (R. Vol. 1 at 133.) Hernandez-Lizardi acquiesced. **[R. Vol. 1 at 234]** The roadside videotape confirms Summers's tone and demeanor remained pleasant and non-intimidating. *See United States v. Ledesma*, 447 F.3d 1307, 1314 (10th Cir. 2006).[7] Not only did Summers refrain from coercive tactics, he conducted the detention in plain view on a public highway without the aid of other officers. *See id.* (noting these as factors indicating a consensual encounter). Nor were there any nonverbal or contextual signals of coercion—aside from the mere fact of extended detention.

Despite the absence of any detectable coercion, Hernandez-Lizardi points to four facts in an attempt to show he did not voluntarily consent to the search of his pickup: (1) Summers "seamless[ly]" transitioned from the initial traffic stop to the extended stop; (2) Hernandez-Lizardi was not advised he could refuse Summers's request to search; (3) Summers's questions were phrased "in the form of mandates"; and (4) Summers communicated with Hernandez-Lizardi in English, even though Hernandez-Lizardi "communicate[s] better in Spanish." (Appellant's Br. at 24-25.)

---

[6] A court can also consider the "physical and mental condition and capacity of the defendant" when those factors are probative. *Glover*, 104 F.3d at 1584.

[7] An officer's "pleasant" manner and tone of voice suggest the consensual nature of the encounter. *United States v. McSwain*, 29 F.3d 558, 563 (10th Cir. 1994).

We cannot see how the first two of these facts are significant in our assessment of the voluntariness of Hernandez-Lizardi's consent. Although Hernandez-Lizardi remained under investigatory detention as Summers continued his questioning and search, "the fact of custody alone has never been enough in itself to demonstrate a coerced . . . consent to search." *Watson*, 423 U.S. at 424. Nor can we accord "controlling significance" to "the absence of proof that [Hernandez-Lizardi] knew he could withhold his consent." *Id.* In short, the law recognizes an inevitable level of pressure inherent in being the subject of law enforcement scrutiny and assumes that an ordinary person can still "exercise a free choice." *Id.* at 425*; see United States v. Soto*, 988 F.2d 1548, 1558 (10th Cir. 1993) ("[A]ny individual being subjected to an investigative detention will feel some degree of compulsion to acquiesce to an officer's request.").

As to the third fact—the phrasing of Summers's requests—the record confirms many of the "requests" were indeed phrased as directives. Nevertheless, the pertinent request here was Summers's request to search the pickup. It was not phrased as a directive. On the contrary, the record unequivocally reflects Summers asked Hernandez-Lizardi for permission to take a "quick look" around the pickup. (R. Vol. 1 at 133.) Summers testified his request was phrased as a question, and the video recording confirms his testimony. Hernandez-Lizardi acknowledges as much in the factual recitation in his brief.

Finally, as to the fourth fact, even if Hernandez-Lizardi was more proficient in Spanish, the record shows he had no problem understanding Summers. Summers testified "there was no misunderstanding at all. They understood exactly what I was asking them." (R. Vol. I at 234.) After reviewing the video recording of the roadside

- 11 -

encounter, the district judge agreed. He concluded "[Hernandez-Lizardi] understood Summers' request." (R. Vol. I at 179.) As Hernandez-Lizardi does not argue this factual finding was clearly erroneous, we are bound to follow it. *See Benard*, 680 F.3d at 1209-10.

The district judge's finding that Hernandez-Lizardi voluntarily consented to the roadside search of his pickup is not clearly erroneous. *See Davis*, 636 F.3d at 1292. To the contrary, it is eminently reasonable.

### *C. Transport to KHP Office, Interrogation, and Second Search of Pickup*

Hernandez-Lizardi next challenges his transport to the KHP office and the subsequent search of his pickup. He claims the encounter turned into a *de facto* arrest because the troopers retained the $14,400 found in the pickup and he was "sandwiched between the vehicles of the troopers" as he was escorted to the KHP office. (Appellant's Br. at 10.) Although his *de facto* arrest argument may have merit, the arrest was justified by probable cause.[8]

"To be lawful, a warrantless arrest must be supported by probable cause to arrest." *United States v. Vazquez–Pulido*, 155 F.3d 1213, 1216 (10th Cir. 1998). "Probable cause exists where the facts and circumstances within the officers' knowledge, and of which they have reasonably trustworthy information, are sufficient in themselves to warrant a man of reasonable caution in the belief that an offense has been or is being committed." *United States v. Maher*, 919 F.2d 1482, 1485 (10th Cir. 1990); *see also United States v.*

---

[8] Based on its reading of *United States v. White*, 584 F.3d 935 (10th Cir. 2009), the government claims no arrest occurred. The district judge apparently agreed. We are not so sure, but it is unnecessary to decide.

*Chavez*, 660 F.3d 1215, 1224 (10th Cir. 2011). We must evaluate the existence of probable cause "in light of circumstances as they would have appeared to a prudent, cautious, trained police officer." *Maher*, 919 F.2d at 1485.

Similarly, a warrantless vehicle search "is permissible if there is probable cause to believe that the vehicle contains contraband." *United States v. Edwards*, 632 F.3d 633, 645 (10th Cir. 2001). "Probable cause to search a vehicle is established if, under the totality of the circumstances, there is a fair probability that the car contains contraband or evidence." *Id.* (quotations omitted).

Here, the facts and circumstances within the KHP troopers' knowledge provided probable cause both to arrest Hernandez-Lizardi and to search the pickup. First, as to the arrest, Summers's observations, questioning, and brief search revealed ample indications that "an offense ha[d] been or [was] being committed." *See Maher*, 919 F.2d at 1485. As we previously observed, even before the quick consensual search of the pickup, Summers was aware of (1) Hernandez-Lizardi's inexplicable use of a dealer's tag even though he claimed to have purchased the pickup; (2) the three mobile phones in the vehicle; (3) the implausible bill of sale Hernandez-Lizardi produced for the pickup; (4) the inconsistency between the home address Hernandez-Lizardi provided compared to the address shown on the bill of sale;[9] (5) Manzanarez-Rivera's nervousness; and (6) Hernandez-Lizardi's "bizarre" travel plans.

Then, as Summers moved to search the pickup, Hernandez-Lizardi suddenly volunteered he had a huge sum of cash in the vehicle even though he had previously

---

[9] Because drug dealers often use their homes as bases for their illicit distribution, a suspect's attempt to conceal his home address can be a factor in favor of the existence of probable cause. *United States v. Whitner*, 219 F.3d 289, 298-99 (3d Cir. 2000); *see United States v. Cardoza*, 713 F.3d 656, 660-61 (D.C. Cir. 2013).

denied having any. The cash was a powerful indicator of illegal activity because it, like the mobile phone, is a well-known tool of the illegal drug trade. *See United States v. Slater*, 971 F.2d 626, 637 (10th Cir. 1992). Although it would be unfair to characterize small quantities of cash as evidence of illegal activity, large quantities of cash are strongly probative of participation in drug distribution. *See United States v. Mendoza-Salgado*, 964 F.2d 993, 1008 (10th Cir. 1992). That is particularly true when the cash is conveniently banded by denomination. *See United States v. $242,484.00*, 389 F.3d 1149, 1161 (11th Cir. 2004) ("A common sense reality of everyday life is that legitimate businesses do not transport large quantities of cash rubber-banded into bundles . . . ."); *United States v. Twelve Thousand, Three Hundred Ninety Dollars ($12,390.00)*, 956 F.2d 801, 806 (8th Cir. 1992) ("[T]he money seized . . . was wrapped in rubber bands, which, according to the unimpeached testimony of a narcotics officer, is characteristic of the way drug money is stored."). Moreover, Hernandez-Lizardi's attempt to conceal the cash further added to the mounting body of evidence of illegal activity. *See United States v. Reed*, 443 F.3d 600, 603-04 (7th Cir. 2006) (concluding a defendant's dishonesty about the presence of cash in a vehicle favors a probable cause determination). The convergence of so many facts suggesting drug trafficking provided Summers with probable cause for the arrest. In addition, because the facts—particularly the large sum of banded cash—strongly suggested Hernandez-Lizardi was using the pickup for drug trafficking, the KHP troopers had probable cause to search the pickup.

The actions of the KHP troopers were appropriately justified at each stage. The motion to suppress was, accordingly, properly denied.

**II. Sufficiency of the Evidence**

- 14 -

Hernandez-Lizardi also contends the evidence was insufficient to sustain his conviction. In particular, he claims the prosecution failed to produce sufficient evidence to establish he possessed the firearms and ammunition found in the pickup. *See* 18 U.S.C. § 922(g). He asserts there was "no forensic evidence showing that [he] had ever handled the firearms or the ammunition," (Appellant's Br. at 29-30), and argues the other evidence of possession was too weak to allow a reasonable jury to infer possession. The record belies his contention.

We review sufficiency of the evidence de novo. *United States v. Triana*, 477 F.3d 1189, 1194 (10th Cir. 2007). In this inquiry, we consider the direct and circumstantial evidence and any inferences the jury could reasonably draw from it. *United States v. Brooks*, 438 F.3d 1231, 1236 (10th Cir. 2006). Viewing the evidence and reasonable inferences in the light most favorable to the prosecution, we ask whether a reasonable jury could find the defendant guilty beyond a reasonable doubt. *Id.* To the extent there are conflicts in the evidence, we defer to the jury's resolution of the conflict. *Id.*

The prosecution must, of course, prove a defendant's knowing possession of contraband. Possession must be either actual or constructive—a defendant's "power and ability" to control the contraband items. *See United States v. King*, 632 F.3d 646, 651 (10th Cir. 2011) (quoting *United States v. Lopez*, 372 F.3d 1207, 1211 (10th Cir. 2004)); *United States v. Al-Rekabi*, 454 F.3d 1113, 1120 (10th Cir. 2006). When the contraband is found in a jointly occupied space the prosecution must also present evidence linking the defendant to the contraband items. *United States v. Mendez*, 514 F.3d 1035, 1041 (10th Cir. 2008). A jury may infer such a link when the evidence "'plausibly supports the inference that the defendant had knowledge of and access to'" the items. *United States v.*

*Bagby*, 696 F.3d 1074, 1081 (10th Cir. 2012) (quoting *King*, 632 F.3d at 652).

The district judge concluded the prosecution had produced ample evidence to show he constructively possessed the guns and ammunition:

> (1) testimony that a cell phone box, which was slightly ajar and contained ammunition for at least two of the firearms seized, was discovered on the floorboard behind the driver's seat; (2) testimony that some of the screws that held the speakers in the speaker box were missing and that screws fitting the speaker box were found in the cubbyhole located in the front dash of the pickup; (3) testimony that an electric drill capable of removing the speaker screws was found in the backdoor on the driver's side; (4) a receipt, which was found in [Hernandez-Lizardi's] pickup, indicating that two products, one of which was a Chevy box, were purchased from Audio Plaza, and electronics store located near [his] home in California, approximately two weeks before [he] was stopped by the KHP trooper; (5) a receipt from a UPS store located near [his] home in California, which was found in [his] pickup, showing that [he] had shipped a package approximately ten days before he was stopped; (6) gas receipts from gas stations located in various towns between California and Kansas, which also were found in [his] pickup; and (7) a bill of sale indicating that [he] had purchased the pickup in Kansas City a little over three weeks before he was stopped.

(R. Vol. 1 at 498-99.)  Based on this evidence, the judge concluded a jury could reasonably find Hernandez-Lizardi possessed the guns and ammunition:

> Based on the bill of sale and the recovered receipts, a reasonable jury could conclude that [Hernandez-Lizardi] had been in continuous control of the pickup for nearly a month.  Further, based on the Audio Plaza receipt, the presence of an electric drill, and the fact that some of the screws were missing from the speaker box and screws fitting the box were located in the front-dash cubbyhole, a jury could reasonably infer that [Hernandez-Lizardi] had knowledge of what was contained in the speaker box.  Lastly, the Government's evidence revealing the presence of a slightly ajar cell-phone box, which contained ammunition for at least two of the firearms discovered, on the floorboard of [Hernandez-Lizardi's] pickup could reasonably lead a jury to conclude that [he] had knowledge of the fact that his vehicle contained ammunition and firearms.

(R. Vol. 1 at 499.)

We agree.  The prosecution presented ample evidence of Hernandez-Lizardi's knowledge of the firearms and ammunition found in the pickup as well as his constructive possession of them.

**AFFIRMED**.

**Entered by the Court:**

**Terrence L. O'Brien**
United States Circuit Judge