NOTICE

Decision filed 01/15/16. The text of this decision may be changed or corrected prior to the filing of a Petition for Rehearing or the disposition of the same.

2016 IL App (5th) 120310

NO. 5-12-0310

IN THE

APPELLATE COURT OF ILLINOIS

FIFTH DISTRICT
_____

| | | |
|---|---|---|
| THE PEOPLE OF THE STATE OF ILLINOIS, | ) | Appeal from the |
| | ) | Circuit Court of |
| Plaintiff-Appellee, | ) | Marion County. |
| | ) | |
| v. | ) | No. 11-CF-233 |
| | ) | |
| ODEY WRIGHT, | ) | Honorable |
| | ) | Michael D. McHaney, |
| Defendant-Appellant. | ) | Judge, presiding. |

_____

JUSTICE GOLDENHERSH delivered the judgment of the court, with opinion.
Presiding Justice Schwarm concurred in the judgment and opinion.
Justice Welch dissented, with opinion.

**OPINION**

¶ 1     After a jury trial in the circuit court of Marion County, defendant, Odey Wright, was convicted of two counts of armed robbery (720 ILCS 5/18-2(a)(2) (West 2010)) and one count of unlawful possession of a controlled substance (less than 15 grams of cocaine) (720 ILCS 570/402(c) (West 2010)). He was sentenced to 40 years on each count of armed robbery, which included an additional 15 years for use of a firearm. He was also sentenced to an extended-term sentence of six years for unlawful possession. The trial court ordered the sentences to run consecutively for a total of 86 years, plus 3 years' mandatory supervised release. Defendant raises three issues on appeal: (1) whether

1

the trial court erred in denying his motion to suppress; (2) whether the trial court committed plain error in responding to a question posed by the jury during deliberations; and (3) whether defense counsel was ineffective for (a) failing to request a lesser-included instruction and/or (b) failing to preserve the jury instruction error underlying the second issue. We reverse and remand.

¶ 2                                    FACTS

¶ 3    On August 5, 2011, at approximately 9 p.m., the Centralia police department received a 911 call from the Caddy Shack bar informing police a masked man carrying a sawed-off shotgun came into the bar and robbed the establishment. There was surveillance tape of the crime. On August 6, 2011, an identical crime was committed at the Centralia Huck's Convenience Store. There was also video footage of this crime. Sergeant Steve Prather of the Centralia police department saw the security footage of the masked suspect from the first robbery and believed that defendant, whom Prather had known throughout his law enforcement career, was the masked suspect.

¶ 4    In the early morning hours of August 7, 2011, Sergeant Prather learned defendant was at a local bar. Prather coordinated efforts among police to arrest defendant as he exited the bar. At defendant's first appearance on August 8, 2011, the State asserted defendant was read his rights pursuant to *Miranda v. Arizona*, 384 U.S. 436 (1966), and was questioned at the scene of his arrest, during which defendant "denied being involved in the robbery, but kept indicating that if police would let him go, he could tell them where the gun and the mask were and who the real robber was." However, it was later

determined defendant had not been read his *Miranda* rights, as Prather made a conscious decision not to Mirandize him. Prather transported defendant to the police station after his arrest, where defendant made additional statements.

¶ 5 Defense counsel filed a motion to suppress statements made by defendant after his arrest. On March 19, 2012, the trial court held a hearing on the motion to suppress. Prather testified he was on duty during the early morning hours of August 7, 2011, working the 11 p.m. to 7 a.m. shift. During his shift, there were several calls regarding an armed robbery of a Huck's store. The robbery occurred a little before midnight. Prather responded to the scene, where he watched the video surveillance tape which showed a large black man, approximately 300 pounds, wearing a mask. It reminded him of an armed robbery which occurred the previous evening at the Caddy Shack bar. Prather recalled, "The main thing was the size and the demeanor, the mannerisms, and walk of the individual that had participated in both of them." After watching the video, Prather recalled seeing a similar man with the same type of walk at Party Liquors earlier in the evening. Prather could not remember the man's name, but after talking to the manager of Party Liquors, April Smith, Prather recalled defendant's name. Prather testified he has known defendant nearly his entire 26-year career as a police officer.

¶ 6 Prather told Smith to call him if defendant showed up at Party Liquors. Approximately 15 to 30 minutes later, the dispatcher informed Prather that a subject matching the description he gave to April Smith showed up at Party Liquors and was spending a lot of money. Prather called Smith and asked her to tell him what type of clothing defendant was wearing. It was the same clothing Prather saw the masked

3

gunman wearing in the Huck's video. Prather advised all police units to go to Party Liquors and surround the perimeter. Prather decided to wait until defendant exited the establishment to arrest him because there was a large crowd and the police did not want to go inside to make an arrest.

¶ 7 Prather saw defendant exit Party Liquors at approximately 1:20 a.m. He was wearing a short-sleeved gray shirt, blue jeans, and white tennis shoes and had the same body type as the person who robbed the Huck's store. Prather said defendant exited the building with "one of the Johnson girls." Prather was not sure if it was Sharon or Inez Johnson, but he knew it was one of them. After defendant got away from the crowd, Prather drew his taser and told defendant to get down on the ground. Defendant was hesitant, but complied when other officers arrived. Defendant was handcuffed. Prather agreed defendant was "clearly in custody."

¶ 8 Prather explained why he did not read defendant his *Miranda* rights as follows:

> "I had no intention of questioning him whatsoever there on scene. Pretty much in my mind I have known, I call [defendant] what I would say is old school, I didn't expect to get a confession from him or pretty much for him to even talk about it. It wasn't my intent to even interrogate him."

Prather told defendant he was being arrested for two armed robberies. Defendant denied any involvement. Prather then informed defendant of the two videos and told him he was welcome to view the videos.

4

¶ 9    Prather placed defendant in his patrol car and drove about a block east to where the Johnson sisters were walking. The police knew there was a connection between Sharon Johnson and defendant. Sharon was defendant's long-time girlfriend with whom he has three grown children. When the police told Sharon they wanted to question her, she wanted to give her personal items to her sister. According to Prather, Sharon pulled "a bunch of currency from her bra." She took $40 from her bra. The currency consisted of 4 five-dollar bills and 20 one-dollar bills. Police then led Sharon to another patrol car and took her to the police station for questioning.

¶ 10    When Prather got back in his patrol car, defendant asked him why Sharon was being arrested. Prather replied that the police believed Sharon might have knowledge of the crime and some of the money she pulled from her bra might have come from the robbery. Defendant told Prather the police needed to let Sharon go because she did not know anything about the crime.

¶ 11    Defendant continued to deny any involvement in the crime. Prather testified that defendant then said that if the police let him and Sharon go free, he could "give us the individual that had robbed the–had committed both robberies and tell us where the gun and mask were. Up to that point the word mask had never been used or gun." Prather told defendant he was not going to let him go free because based upon the surveillance video, he was convinced defendant was involved. Prather transported defendant to the police station, where he was placed in a holding cell where he remained handcuffed.

5

¶ 12 A video camera recorded the events in the holding cell. The video shows Prather speaking with defendant several times while defendant was in the holding cell. Prather admitted defendant was not read his *Miranda* rights at the police station and explained the lack of *Miranda* warnings:

> "It's just one of those things, I have been on long you have [*sic*], and I have known [defendant] long enough that he is not–he is not that 17 year old kid that I am going to buffalo into telling him something. And I felt strong enough about the video I had watched, with the clothes he was wearing, that I wasn't going to question him. That was never my intent."

Prather testified it would have been a waste of time to Mirandize defendant.

¶ 13 In the holding cell, defendant continued to assert he had not been involved in the armed robberies. Defendant said Prather should know he does not commit this kind of crime. Prather agreed, except pointed out to defendant that defendant had been convicted of an armed robbery "up north." Defendant told Prather he could lead Prather to the guys who gave him the clothes. Prather told defendant that was ridiculous to even say that. He told defendant it was not "fantastic police work, it was a simple video surveillance system that had him hemmed up and charged with what he was charged with." Prather admitted he asked defendant a question while in the holding cell. He specifically asked him who had given him the clothes. Defendant did not respond.

¶ 14 The videotape of defendant in the holding cell was introduced into evidence. Prather testified he watched the video the night before the hearing and admitted there was a time during which defendant can be heard yelling, "I want a lawyer." Prather said he

6

was not in the holding cell with defendant at that time and was not aware defendant made such a statement until the night before when he watched the videotape.

¶ 15    On cross-examination, Prather admitted that once defendant said the police were mistaken, Prather defended his position and continued to engage defendant in conversation.  Prather also admitted defendant did not say anything about a gun and a mask until after defendant saw Sharon being questioned by police.

¶ 16    Ultimately, the motion to suppress was denied, and Prather was permitted to testify at trial about defendant's statements while in custody.  In its order the trial court stated it found Prather "completely credible" and found "[t]he banter between defendant and officer Prather, which the defendant initiated, does not even approach the type of situation in which the concerns that govern *Miranda* are implicated."  Defense counsel renewed his arguments concerning suppression at the close of *voir dire* and in a posttrial motion.

¶ 17    All three charges proceeded to jury trial.  Prather's testimony was consistent with his testimony during the suppression hearing as to how defendant was arrested, including the incriminating statements defendant made while in custody.  Prather also testified when defendant was arrested he had $75 cash and a white small colored rock in his pants' pocket.  Prather recognized the rock as cocaine.

¶ 18    Sharon Johnson testified she was with defendant when he was arrested.  They have a long-standing relationship and have three children together.  The children are all over the age of 20.  Defendant gave her $28 dollars while they were in Party Liquors.  He told

7

her he had not done much for her or the children and wanted her to have it. She did not think much about it and just stuffed it in her bra.

¶ 19 The State also offered the testimony of Mark Owensby, an expert in firearm recognition. Owensby testified over defense counsel's objection that the same firearm was used in both robberies. His conclusion was based primarily on security footage stills from the second robbery. At the close of the State's evidence, defense counsel moved for a directed verdict on the first robbery on the basis that Owensby testified he was unable to identify whether a firearm was used during the first robbery. Defense counsel also argued "with respect to [the first robbery], there is no lesser included of aggravated robbery or it being like a weapon or similar weapon or a weapon that had the appearance of a firearm such as the air soft." The trial court denied the motion. As to the possession charge, the State offered the testimony of Captain Densmore for chain of custody, and Joel Gray, an expert, who testified the substance found on defendant tested positive for cocaine base.

¶ 20 During closing argument, the State argued the strength of its case rested on defendant's statements. The prosecutor specifically asserted that "the bottom line" in the case was that defendant made statements no innocent man would make. In response, defense counsel argued the State failed to present direct evidence of defendant's guilt of the armed robbery charges, and the State's case was at best coincidental.

¶ 21 Defense counsel further asserted defendant's incriminating statements were the result of Prather deliberately choosing not to Mirandize defendant and the result of

8

defendant's attempt to barter for his girlfriend's freedom. Defense counsel admitted defendant was guilty of possession; however, he asked the jury not to hold that against defendant when determining his fate on the armed robbery charges.

¶ 22 During deliberations, the jury sent the following question to the judge: "The jury is questioning the fact that the Miranda rights were not read to the defendant. How does it impact our deliberations?" Ultimately, the trial court responded to the jury with a note stating, "IT DOES NOT." After completing deliberations, the jury returned guilty verdicts on all three counts. The trial court sentenced defendant to 40 years on each armed robbery count and 6 years on the possession count, and ordered the sentences to run consecutively for a total of 86 years. Defendant now appeals.

¶ 23                                     ANALYSIS

¶ 24 The first issue is whether the trial court erred in denying defendant's motion to suppress. Defendant raises three arguments with regard to this issue: (1) the trial court's finding that defendant initiated the exchange with Prather is against the manifest weight of the evidence and shows the trial court's factual findings are wrong and not worthy of deference by this court; (2) Prather did, in fact interrogate defendant; and (3) the State cannot prove admission of defendant's incriminating statements was harmless beyond a reasonable doubt. The State concedes defendant was in custody for purposes of *Miranda* at the time he made the statements to Prather and that defendant was not Mirandized, but argues the trial court did not err in denying the motion to suppress because Prather's testimony and the video showing defendant in the holding cell indicate that defendant is

9

the one who asked questions, claimed his innocence, and offered to assist the police with their investigation. Officers were merely responding to defendant.

¶ 25    The fifth amendment provides no person shall be compelled in any criminal case to be a witness against himself. U.S. Const., amend. V. Pursuant to *Miranda v. Arizona*, "the prosecution may not use statements, whether exculpatory or inculpatory, stemming from custodial interrogation of the defendant unless it demonstrates the use of procedural safeguards effective to secure the privilege against self-incrimination." 384 U.S. at 444. These safeguards include the now-familiar *Miranda* warnings or their equivalent.

¶ 26    In *Miranda*, the Supreme Court concluded that "without proper safeguards the process of in-custody interrogation of persons suspected or accused of crime contains inherently compelling pressures which work to undermine the individual's will to resist and to compel him to speak where he would not otherwise do so freely." 384 U.S. at 467. Defendant contends that because he received no *Miranda* warnings, his statements should have been suppressed. While the State concedes defendant was in custody at the time he made the statements, it insists Prather's conduct did not constitute interrogation.

¶ 27    When reviewing a trial court's denial of a motion to suppress, a bifurcated standard of review is applied. We review the trial court's factual findings under a manifest weight standard, but we apply a *de novo* standard to the ultimate question of whether the evidence should be suppressed. *People v. Bonutti*, 212 Ill. 2d 182, 188, 817 N.E.2d 489, 492 (2004).

¶28 *Miranda* suggests interrogation refers only to actual "questioning initiated by law enforcement officers" (384 U.S. at 444); however, later clarification by the Supreme Court indicates police practices can be a violation of *Miranda* even though no express questioning by police is involved. For example, in *Rhode Island v. Innis*, 446 U.S. 291 (1980), the Supreme Court reviewed the "interrogation environment" and found some police practices violate *Miranda* even without express questioning, specifically stating as follows:

> "[T]he *Miranda* safeguards come into play whenever a person in custody is subjected to either express questioning or its functional equivalent. That is to say, the term 'interrogation' under *Miranda* refers not only to express questioning, but also to any words or actions on the part of the police (other than those normally attendant to arrest and custody) that the police should know are reasonably likely to elicit an incriminating response from the suspect. The latter portion of this definition focuses primarily upon the perceptions of the suspect, rather than the intent of the police. This focus reflects the fact that the *Miranda* safeguards were designed to vest a suspect in custody with an added measure of protection against coercive police practices, without regard to objective proof of the underlying intent of the police. A practice that the police should know is reasonably likely to evoke an incriminating response from a suspect thus amounts to interrogation. But, since the police surely cannot be held accountable for the unforeseeable results of their words or actions, the definition of interrogation can extend only to words or actions on the part of police officers that they *should have known* were

11

reasonably likely to elicit an incriminating response."  (Emphasis in original.)  446 U.S. at 300-02.

Accordingly, our focus is on defendant's perceptions, not on Prather's intentions.

¶ 29   Unfortunately, in the instant case, the focus at the suppression hearing was on Prather's intentions rather than defendant's perceptions.  At the hearing, Prather said he did not issue *Miranda* because defendant was "old school" and Prather never expected to get a confession out of him or even expected him to talk about it, so "[i]t wasn't my intent to even interrogate him."  Later in the hearing, Prather admitted he did not advise defendant of his *Miranda* rights even when he put defendant in the holding cell because Prather felt the video was strong enough evidence that he did not need to interrogate defendant.  Prather specifically stated interrogation "was never my intent."

¶ 30   In *Innis*, police officers arrested the defendant for robbery with a sawed-off shotgun, but found him unarmed.  While in transit to the police station, the officers had a "brief conversation" with each other about the missing shotgun, which everyone in the car including the defendant heard.  *Innis*, 446 U.S. at 303.  Referring to a nearby school for handicapped children, one officer said to another, " '[I]t would be too bad if [a] little [handicapped] *** girl *** pick[s] up the gun, maybe kill[s] herself.' "  446 U.S. at 295.  At this point, the defendant interrupted the officers' conversation and offered to show them where the gun was located.  446 U.S. at 295.  The Court ruled the officers' conversation did not constitute interrogation for *Miranda* purposes because the entire conversation consisted of "no more than a few off hand remarks" and was not "a lengthy harangue in the presence of the suspect."  446 U.S at 303.  The officers' comments were

not "particularly 'evocative' " and there was no evidence the officers were "aware that the [defendant] was peculiarly susceptible to an appeal to his conscience concerning the safety of handicapped children." 446 U.S. at 302-03. The Court concluded the officers should not have known their conversation was reasonably likely to elicit an incriminating response from the defendant and therefore did not subject the defendant to the functional equivalent of interrogation under *Miranda.*

¶ 31    In the instant case, to the contrary, we find Prather's language and actions particularly evocative. Not only did Prather handcuff defendant, place him in the back of a patrol car, and engage him in ongoing conversation, including asking at least one question and discussing the evidence against him, but also Prather drove defendant to an area where defendant could see Sharon, the mother of his three children, being questioned by police. Defendant saw Sharon remove money from her bra and place it on a table. He then saw her being placed in the back of another police car, at which time he assumed she was being arrested for a crime in which she was not involved. Unlike the police actions in *Innis*, the police actions here are particularly evocative and likely to elicit an incriminating response from defendant. Most people would be susceptible after seeing their loved one implicated in a crime in which he or she had not participated.

¶ 32    At the suppression hearing, Prather admitted that after he placed defendant under arrest, he not only defended his position to defendant that defendant was guilty, but also continued to engage defendant in conversation. Prather also admitted defendant did not say anything about either a gun or a mask until after defendant saw Sharon being questioned by police. Under these circumstances, the trial court's finding that the

13

"banter" between defendant and Prather did not approach the type of situation in which the concerns that govern *Miranda* are implicated is against the manifest weight of the evidence. The fact that Prather never intended to question defendant and never expected defendant to make an admission or incriminating statements is not what matters. Nor does it matter that the trial court found Prather "completely credible." What matters is defendant's perception of the events. What happened to defendant was the "functional equivalent" of a police interrogation, and it clearly undermined defendant's privilege against self-incrimination.

¶ 33 Looking at the totality of the circumstances from defendant's vantage point, it is clear Prather subjected defendant to an interrogation likely to elicit an incriminating response without providing him the warnings demanded by *Miranda.* The trial court committed constitutional error by allowing the State to introduce defendant's statements at trial, and we must reverse unless the State establishes that the improper admission of defendant's statements was harmless beyond a reasonable doubt. *People v. Daniels*, 391 Ill. App. 3d 750, 793, 908 N.E.2d 1104, 1137-38 (2009). In order for an error to be harmless, a reviewing court must be satisfied beyond a reasonable doubt that the error did not contribute to the defendant's conviction. *Daniels*, 391 Ill. App. 3d at 793, 908 N.E.2d at 1138.

¶ 34 In the instant case, during closing, the prosecutor argued as follows:

"Is it just a coincidence that even notwithstanding all the other things I've told you, when Sergeant Prather made contact with this defendant he made statements no

14

innocent man would make. And that's really the bottom line. Let Sharon go, she doesn't know anything about it. Let us both go and I'll lead you to the gun and mask and the real robber. Is that how somebody who is told, you know what, you are being arrested for two armed robberies, is that how they respond if they know they didn't do it? And not only know they didn't do it, but know who did it? No, they don't bargain, they don't respond that way. They say, whoa, you got the wrong guy, I know who did it and it was so and so. But that's not what we heard here. And when that didn't work, to go on to say – confronted him because he's wearing the exact clothing from the Huck's video. Say, well, let me go and I'll tell you who I borrowed these clothes from in the two hour frame of when the robbery occurred and when you found me which is just ludicrous on its face. It's ludicrous."

Under these circumstances, where the prosecutor specifically asserted to the jury that "the bottom line" in the case was that defendant made statements no innocent man would make, we cannot say the admission of defendant's statements was harmless beyond a reasonable doubt.

¶ 35                                CONCLUSION

¶ 36    We find the trial court erred in denying defendant's motion to suppress and the admission of defendant's statements was not harmless beyond a reasonable doubt. Therefore, we reverse the trial court's erroneous admission of defendant's inculpatory statements and remand for a new trial. Because the first issue raised by defendant is dispositive, we need not address the two additional issues raised in this appeal.

15

¶ 37    For the foregoing reasons, we reverse the judgment of the circuit court of Marion County and remand for a new trial.

¶ 38    Reversed and remanded.

¶ 39    JUSTICE WELCH, dissenting.

¶ 40    I would affirm the trial court's decision to deny the defendant's motion to suppress, as I believe that the defendant was not under the functional equivalent of an interrogation. As the trial court noted in its ruling, "*Miranda* does not require police to interrupt a suspect in the process of making a spontaneous statement in order to warn him of his constitutional rights, and a statement made in the absence of any questioning is not inadmissible by virtue of the failure to give such warning." The definition of "interrogation" provided by the Supreme Court in *Rhode Island v. Innis*−that is, any words or actions on the part of the police that the police should know are reasonably likely to elicit an incriminating response from the suspect−affords a disconcerting amount of vagueness, giving rise to a slippery slope in its application. As our courts apply the rule in *Innis*, I foresee an escalating frustration of law enforcement's pursuit of criminal wrongdoing, as police officers feel increasingly compelled to provide *Miranda* warnings immediately upon arrest−even though it is clear that the warnings are required when the suspect is subjected to interrogation, not custody. See *Innis*, 446 U.S. at 299-300. Here, the defendant freely engaged in conversation with Officer Prather immediately after his arrest, and volunteered information about the crime while in the squad car. *Miranda* does

16

not require that the police, in essence, gag the defendant after arrest because he may say something incriminating, and neither should our interpretation of *Innis* reach such a conclusion in this case.  For the foregoing reasons, I respectfully dissent.

2016 IL App (5th) 120310

NO. 5-12-0310

IN THE

APPELLATE COURT OF ILLINOIS

FIFTH DISTRICT

_____

THE PEOPLE OF THE STATE OF ILLINOIS,    )    Appeal from the
                                        )    Circuit Court of
    Plaintiff-Appellee,             )    Marion County.
                                        )
v.                                      )    No. 11-CF-233
                                        )
ODEY WRIGHT,                            )    Honorable
                                        )    Michael D. McHaney,
    Defendant-Appellant.            )    Judge, presiding.
_____

**Opinion Filed:**        January 15, 2016
_____

| **Justices:** | Honorable Richard P. Goldenhersh, J. |
| --- | --- |
| | Honorable S. Gene Schwarm, P.J., Concurred Honorable Thomas M. Welch, J., Dissented |

_____

| **Attorneys for Appellant** | Michael J. Pelletier, State Appellate Defender, Ellen J. Curry, Deputy Defender, Alexander G. Muntges, Assistant Appellate Defender, Office of the State Appellate Defender, Fifth Judicial District, 909 Water Tower Circle, Mt. Vernon, IL 62864 |
| --- | --- |

_____

| **Attorneys for Appellee** | Hon. Matt Wilzbach, State's Attorney, Marion County Courthouse, P.O. Box 157, Salem, IL 62881; Patrick Delfino, Director, Stephen E. Norris, Deputy Director, Kelly M. Stacey, Rebecca E. McCormick, Staff Attorneys, Office of the State's Attorneys Appellate Prosecutor, Fifth District Office, 730 E. Illinois Highway 15, Suite 2, P.O. Box 2249, Mt. Vernon, IL 62864 |
| --- | --- |

_____