2025 IL App (1st) 230639

No. 1-23-0639

Filed August 27, 2025

Third Division

IN THE

APPELLATE COURT OF ILLINOIS

FIRST DISTRICT

| | | |
|---|---|---|
| THE PEOPLE OF THE STATE OF ILLINOIS, | ) | Appeal from the |
| | ) | Circuit Court of |
| Plaintiff-Appellee. | ) | Cook County. |
| | ) | |
| v. | ) | No. 22 CR 5627 |
| | ) | |
| STEVE RAINEY, | ) | Honorable |
| | ) | Alfredo Maldonado |
| Defendant-Appellant. | ) | Judge, Presiding |

JUSTICE MARTIN delivered the judgment of the court, with opinion.
Presiding Justice Lampkin and Justice Reyes concurred in the judgment and opinion.

**OPINION**

¶ 1    Following a jury trial, Steve Rainey was convicted of violating the armed habitual criminal (AHC) statute and sentenced to 12 years' imprisonment. On appeal, he argues the trial court erred by (1) denying his motion to suppress statements, (2) admitting evidence of recovered ammunition, and (3) failing to account for mitigating factors in determining his sentence. We find Rainey's statements should have been suppressed, as they were obtained during a custodial interrogation without *Miranda* warnings (see *Miranda v. Arizona*, 384 U.S. 436 (1966)) and were not admissible under the public safety exception. We also find admission of the statements was not harmless beyond a reasonable doubt. Therefore, we reverse the conviction and remand for a new trial.

¶ 2                                    I. BACKGROUND

¶ 3        After jury selection, Rainey filed a motion to suppress statements. Despite the untimely filing, the trial court permitted a hearing on the motion.

¶ 4        The hearing evidence consisted solely of testimony from Chicago police officer Sergio Martinez. As part of a narcotics investigation, Officer Martinez applied for and obtained a search warrant supported by his own affidavit. The warrant authorized police to search for "narcotics and any other illegal contraband" in the second-floor apartment of an address on West 81st Street in Chicago. Rainey was the target of the search warrant. Officer Martinez knew Rainey had prior convictions for drug and firearm offenses. Officer Martinez and 8 to 10 other officers, each armed and wearing a bulletproof vest, executed the warrant on the evening of April 18, 2022.

¶ 5        Upon entering the apartment, the officers located two adults, who were then handcuffed and placed in a living area. The officers also discovered a locked bedroom door. After demands to open the door received no response, Officer Martinez kicked the door open, finding Rainey and his girlfriend inside the room. Rainey told the officers his name was Steve Welch. Both Rainey and his girlfriend were handcuffed and escorted to the living area to sit with the other two occupants, while officers stood guard. Rainey's person was searched. Officer Martinez did not consider Rainey free to leave and he would have stopped Rainey had he attempted to leave. Armed officers were positioned at both the front and rear entrances to the building.

¶ 6        After going "in and out of the bedroom multiple times," Officer Martinez summoned Rainey to accompany him to the bedroom. Officer Martinez informed Rainey he was the target of the search warrant and part of a narcotics investigation. Officer Martinez then asked, "What am I going to find that should not be here?" Rainey responded, "a gun." Officer Martinez asked where it was located, and Rainey replied he did not know. Officer Martinez then asked, "But it's in here?"

Rainey nodded and said "yes" in a low voice. Officer Martinez then asked Rainey further questions about selling "dope" and whether narcotics were present. After their conversation, Rainey was taken outside and placed in a police vehicle. Officers then searched the bedroom. After removing a mattress and box spring that were situated atop milk crates, an officer discovered a handgun inside a zipped black, fanny-pack type bag, which was on the floor amid the crates.

¶ 7    During his hearing testimony, Officer Martinez explained that, when executing a search warrant, he asks the subject whether "anything" is present before conducting a search. He does so to give the subject a chance to avoid their belongings from being "turned upside-down." Officer Martinez also answered that he had made sure "safety was accomplished" before he questioned Rainey. When asked whether he was worried someone could enter the bedroom to interrupt the search, he answered, "Maybe. Maybe not. Depends on the situation."

¶ 8    The State argued, *inter alia*, Rainey's statements were admissible based on the public safety exception to the *Miranda* rule. The court rejected their argument, characterizing it as a "blanket" that would cover every situation within the public safety exception. Nevertheless, the court denied the motion to suppress Rainey's statements, finding the situation a "close case *** bordering on a custodial interrogation."

¶ 9    At trial, Officer Martinez testified consistently with his suppression hearing testimony. In addition, the jury viewed video footage from Officer Martinez's body-worn camera (BWC), which was not played at the suppression hearing. The BWC video depicts Officer Martinez's interaction with Rainey more fully than the officer's testimony. The video shows him kick the door three times before Rainey opens it, which is inconsistent with the testimony that Officer Martinez entered the room by kicking the door in. The audio captured their subsequent conversation as follows:

"Officer Martinez: What am I gonna find that shouldn't be here?

Rainey: A gun.

Officer Martinez: Huh?

Rainey: A gun.

Officer Martinez: Where? Is it underneath the bed?

Rainey: Uh…I think it's…I don't know. I'm not going to lie.

Officer Martinez: Where'd you put it, though?

Rainey: I was sick as hell. I ain't been up.

Officer Martinez: But it's in here, right?

Rainey: Uh-huh."

¶ 10     In addition to Officer Martinez, Sergeant Connor Brackin, who also participated in the execution of the search warrant, testified. The officers testified they found 36 bullets of various calibers during their search of the bedroom. Only three bullets found on the windowsill matched the caliber of the recovered handgun. Other bullets were found atop the box spring when the mattress was removed. More bullets were found in a backpack. Some bullets were visible in the video played for the jury. Police also found a letter from a hospital addressed to "Steve Welch," at the address of the apartment, inside the backpack. The parties stipulated Rainey had two prior qualifying felony convictions.

¶ 11     In its closing argument, the State relied on Rainey's response to Officer Martinez's question as evidence of his constructive possession of the recovered firearm. The prosecutor referred to his statements multiple times and replayed the portions of the video in which Rainey answered "a gun" in response to Officer Martinez's question.

¶ 12     The jury found Rainey guilty of AHC, and the court sentenced him to 12 years' imprisonment. This appeal followed.

¶ 13                                    II. ANALYSIS

¶ 14                              A. Admission of Statements

¶ 15        Rainey first challenges the trial court's ruling denying his motion to suppress statements. A bifurcated standard of review applies to a trial court's ruling on a motion to suppress statements: deference to the trial court's credibility determinations and findings of fact, under a manifest-weight standard, and *de novo* review on questions of law, including the ultimate question of whether the statements should be suppressed. *People v. Tucker*, 2022 IL App (1st) 172982, ¶ 36. Only questions of law are at issue here, so our review is *de novo*. In addition to the suppression hearing, we may consider evidence adduced at trial. *People v. Slater*, 228 Ill. 2d 137, 149 (2008).

¶ 16        In *Miranda*, 384 U.S. 436, the United States Supreme Court established that the fifth amendment privilege against self-incrimination applied not only in court but in any place a person faces custodial interrogation. *People v. Logan*, 2024 IL 129054, ¶ 57. Custodial interrogation is " 'questioning initiated by law enforcement officers after a person has been taken into custody or otherwise deprived of his freedom of action in any significant way.' " *Id.* (quoting *Miranda*, 384 U.S. at 444). To protect this right, the prosecution may not use statements made by a defendant during a custodial interrogation unless those statements were accompanied by procedural safeguards, now known familiarly as *Miranda* warnings. *Id.* Accordingly, statements obtained in violation of *Miranda* may not be admitted as substantive evidence in the prosecution's case-in-chief. *Id.* ¶ 58.

¶ 17        To determine whether a person was in custody, we conduct two discrete inquiries: "first, what were the circumstances surrounding the interrogation; and second, under those circumstances, would a reasonable person have felt he or she was not at liberty to terminate the interrogation and leave." (Internal quotation marks omitted.) *Id.* ¶ 59.

¶ 18    We consider the totality of the circumstances and weigh all relevant factors when determining whether a person was in custody; no single factor is dispositive. *Id.* ¶ 60 (citing *People v. Wyma*, 2020 IL App (1st) 170786, ¶ 57). Relevant factors include:

> " 'the location, time, length, mood, and mode of the questioning; (2) the number of police officers present during the interrogation; (3) the presence or absence of family and friends of the individual; (4) any indicia of a formal arrest procedure, such as the show of weapons or force, physical restraint, booking or fingerprinting; (5) the manner by which the individual arrived at the place of questioning; and (6) the age, intelligence, and mental makeup of the accused.' " *Id.* (quoting *Slater*, 228 Ill. 2d at 150).

In addition, "[a]n officer's belief in the individual's guilt is relevant only to the extent that 'the officer's views or beliefs were somehow manifested to the individual under interrogation and would have affected how a reasonable person in that position would perceive his or her freedom to leave.' " *Id.* (quoting *Stansbury v. California*, 511 U.S. 318, 325 (1994)). Other factors courts have deemed relevant to the custody analysis include " 'whether and to what extent the person has been made aware that he is free to refrain from answering questions' " and " 'the degree of police control over the environment in which the interrogation takes place, and in particular whether the suspect's freedom of movement is physically restrained or otherwise significantly curtailed.' " *Id.* (quoting *Sprosty v. Buchler*, 79 F.3d 635, 641 (7th Cir. 1996)).

¶ 19    Here, the police controlled the environment. Numerous officers were present, and the entrances were guarded. All occupants were placed in handcuffs and held in a living area. Rainey's subsequent movement to and from the bedroom only occurred upon police direction and escort. Thus, police deprived Rainey of his freedom of movement and action in a significant way. In addition, Officer Martinez informed Rainey that he was the target of a search warrant in a narcotics

investigation. Coupled with the question presupposing that the officers would find something "that should not be there," Officer Martinez manifested his belief that Rainey was guilty of a crime. Officer Martinez's testimony confirmed Rainey was not free to leave. And Rainey was not informed he was free to refrain from answering questions. Under these circumstances, a reasonable person would not have felt at liberty to terminate the questioning and leave. Thus, we conclude Rainey was in custody.

¶ 20     We turn to consider whether Rainey was subjected to an interrogation. Interrogation, for purposes of *Miranda*, "refers both to express questioning and to any words or actions on the part of the police, other than those normally accompanying arrest and custody, that the police should know are reasonably likely to elicit an incriminating response from the suspect." *People v. Olivera*, 164 Ill. 2d 382, 391-92 (1995) (citing *Rhode Island v. Innis*, 446 U.S. 291, 301 (1980)).

¶ 21     We believe Officer Martinez should have known his questions were reasonably likely to elicit an incriminating response from Rainey. Officer Martinez informed Rainey he was the target of the search warrant and under investigation before asking, "What am I going to find that should not be here?" The question presupposed the presence of contraband and a response confirming so would necessarily be incriminating. Officer Martinez testified that he asks the question to give a suspect the opportunity to avoid having their belongings turned "upside down." Even if well-intentioned, the option requires the suspect to choose between disclosing the location of contraband, thereby incriminating themselves, or having their home ransacked. Thus, Officer Martinez's stated purpose does not negate that the question is reasonably likely to elicit an incriminating response.

¶ 22     In addition, Officer Martinez did not pose a single question, but a line of questioning, with the purpose of getting Rainey to reiterate his knowledge of the handgun's presence and reveal its

precise location. This line of questioning was more characteristic of an interrogation and unlike routine questioning that normally accompanies an arrest.

¶ 23    We also find Officer Martinez's subsequent questions about "dope" revealing.[1] Those questions disclose that the purpose of his conversation with Rainey was to obtain incriminating evidence from him. See *People v. Fort*, 2014 IL App (1st) 120037, ¶ 18 ("A question as to whether a defendant has contraband qualifies as interrogation, likely to elicit an incriminating response."). Indeed, the purpose of the warrant was to search for illegal drugs.

¶ 24    We also note that Officer Martinez separated Rainey from the other apartment occupants before posing questions to him. Questioning a suspect apart from family members, friends, or other witnesses is common in police interrogation. It prevents others from assisting or influencing the suspect and enables police to confront the suspect with inconsistencies from others' statements. Thus, we view separation as indicative of interrogation. See *Wyma*, 2020 IL App (1st) 170786, ¶ 57 (factors to consider in determining whether a person was subjected to a custodial interrogation include the presence of absence of family and friends).

¶ 25    The parties agree *Fort* is on point but differ on which conclusion it supports. Like this case, the police in *Fort* executed a search warrant for narcotics and gathered the occupants of a home in the living room. *Fort*, 2014 IL App (1st) 120037, ¶ 3. The defendant asked for permission to retrieve her baby from a bedroom. *Id.* ¶ 14. After obtaining permission from his supervisor, an officer escorted the defendant to the bedroom. *Id.* When they reached the door, the officer asked her " 'if there [was] anything in the room [police] should know about because the room eventually is going to get searched anyway.' " *Id.* ¶ 4. The defendant responded that she had some cocaine

---

[1]This questioning was not depicted in the video played at trial. At oral argument, the State indicated it was edited out. As noted, however, Officer Martinez testified at the suppression hearing that this discussion occurred.

inside a pillowcase on the bed. *Id.* In the majority's view, the defendant's need for police permission and an escort demonstrated her freedom of activity was deprived in a significant way and, therefore, she was in custody. *Id.* ¶ 15. The majority likewise found the question was an interrogation, since the question applied to any contraband the police might find. *Id.* ¶ 18.

¶ 26     The circumstances surrounding Rainey's questioning are similar to those in *Fort*. As noted, Rainey's freedom of movement was restrained when multiple officers entered the premises and gathered the occupants, held under guard, in one location. Furthermore, Officer Martinez's initial question was nearly identical to the question put to the defendant in *Fort*. Thus, like the court in *Fort*, we find a custodial interrogation occurred. Yet, the facts supporting that conclusion are more compelling here. Whereas the officer in *Fort* asked a single question, Officer Martinez persisted with a line of questioning regarding both a firearm and narcotics. The State's attempts to distinguish *Fort* are unpersuasive.

¶ 27     Nonetheless, the State contends that even if a custodial interrogation occurred, Rainey's statements were admissible under the public safety exception to the *Miranda* rule. The public safety exception permits admission of custodial statements not preceded by *Miranda* warnings when police reasonably believed questioning was "necessary to secure their own safety or the safety of the public." *New York v. Quarles*, 467 U.S. 649, 659 (1984). Whether facts support an exception to the *Miranda* requirement is a question of law reviewed *de novo*. *United States v. Liddell*, 517 F.3d 1007, 1009 (8th Cir. 2008).

¶ 28     In *Quarles*, police pursued a reportedly armed rape suspect inside a supermarket. 467 U.S. at 651-52. After apprehending and handcuffing the suspect, an officer discovered him wearing an empty shoulder holster. *Id.* at 652. The officer asked him where the gun was. *Id.* The suspect nodded in the direction of some empty cartons (where a handgun was later recovered) and said,

" 'the gun is over there.' " *Id.* The United States Supreme Court held that a " 'public safety' " exception made the statement admissible despite the lack of *Miranda* warnings. *Id.* at 655. The Court believed "the need for answers to questions in a situation posing a threat to the public safety outweighs the need for the prophylactic rule protecting the Fifth Amendment's privilege against self-incrimination." *Id.* at 657. Since the police had reason to believe the suspect had just discarded a gun in the supermarket, it was necessary for them to ascertain its whereabouts. *Id.* "[I]t obviously posed more than one danger to the public safety: an accomplice might make use of it, a customer or employee might later come upon it." *Id.*

¶ 29        The Court described the public safety exception as "narrow." *Id.* at 658. It also explained that the exception's availability does not depend on the motivation of the individual officers involved. *Id.* at 655-56. The exception accounts for a "kaleidoscopic situation *** where spontaneity rather than adherence to a police manual is necessarily the order of the day." *Id.* at 656. An officer confronting such a situation "would act out of a host of different, instinctive, and largely unverifiable motives—their own safety, the safety of others, and perhaps as well the desire to obtain incriminating evidence from the suspect." *Id.* So the exception "should not be made to depend on *post hoc* findings at a suppression hearing concerning the subjective motivation of the arresting officer." *Id.* It applies so long as the questioning "relate[s] to an objectively reasonable need to protect the police or the public from any immediate danger." *Id.* at 659 n.8. The exception, however, does not apply when officers pose "questions designed solely to elicit testimonial evidence from a suspect." *Id.* at 658-59.

¶ 30        The State cites federal appellate decisions where the public safety exception was applied to circumstances akin to those before us, such as in *United States v. Newton*, 369 F.3d 659 (2d Cir. 2004). There, police had gone to a house to conduct a " 'safety search' " after receiving a report

that Newton, who was on parole, had threatened to kill his mother and her husband and kept a gun in a shoe box. *Id.* at 663. Officers handcuffed Newton, seated him in a chair, and accounted for the home's other occupants. *Id.* An officer then asked Newton whether he had any " 'contraband' " in the house. *Id.* Newton motioned toward a shoe box on a table and said, " 'only what is in the box.' " *Id.* at 663-64. The officer asked what was in the box and Newton responded, " 'a two and two.' " *Id.* at 664. The officer opened the box and discovered a .22-caliber automatic firearm, a magazine, and loose rounds. *Id.* The officer asked Newton what he was doing with a gun while on parole, and Newton replied that he kept it for protection. *Id.*

¶ 31    Citing *Quarles*, the Second Circuit found the circumstances justified unwarned questioning. The officers had been informed Newton kept a gun in the home and he had threatened to kill his mother and her husband. *Id.* at 678. Thus, the police could believe "Newton was dangerous, that he and his family were involved in a volatile domestic dispute, and that, until the gun was found, there was a serious and immediate risk of harm to anyone in the apartment." *Id.* The court rejected the argument that the public safety exception did not apply since the question inquired about "contraband" instead of weapons. *Id.* at 678-79. It noted that "public safety questions are framed spontaneously in dangerous situations" where "[p]recision crafting cannot be expected." *Id.* at 678. The broad question encompassed firearms and Newton's response reveals he understood its meaning. *Id.* at 679. The *Newton* court followed similar decisions. See *United States v. Williams*, 181 F.3d 945, 953 (8th Cir. 1999) (finding response to the question, " 'is there anything we need to be aware of?' " admissible); see also *United States v. Reyes*, 353 F.3d 148, 150, 155 (2d Cir. 2003) (the same for whether a defendant had " 'anything on him that [could] hurt [the officer] or anyone on [the] field team' ").

¶ 32    Although the *Newton* court found admissible the responses to questions asked before the gun was found, the court determined the public safety exception did not extend to the unwarned questioning that occurred after. See *Newton*, 369 F.3d at 679-80. When police recovered the firearm, it was clear Newton would be formally arrested, and the weapon no longer posed a danger. *Id.* at 679. This court applied *Newton*'s distinction in *People v. Hannah*, 2013 IL App (1st) 111660, ¶ 47, finding the public safety exception did not apply when police asked, " 'whose gun is this?' " after already recovering a firearm. See *People v. Roundtree*, 135 Ill. App. 3d 1075, 1079-80 (1985) (public safety exception found inapplicable when all occupants were handcuffed and positioned away from their vehicle and officer asked who owned a suitcase found in the vehicle).

¶ 33    Similarly, the Seventh Circuit applied the public safety exception in a case that, like this one, involved execution of a warrant. In *United States v. Are*, 590 F.3d 499, 504 (7th Cir. 2009), police obtained a warrant to arrest Antwan Daniels for drug conspiracy.[2] After being admitted to his home, officers handcuffed Daniels and brought him to the living room along with his wife and two young children. *Id.* An FBI agent asked Daniels whether there were any weapons in the house. *Id.* He replied that an AK-47 rifle was in his bedroom, where officers eventually found it. *Id.* at 504-05.

¶ 34    The court found the FBI agent's question was "within the 'public safety' exception" because it "seemed 'reasonably prompted by a concern for the public safety.' " *Id.* at 506 (quoting *Quarles*, 467 U.S. at 656). Factors justifying the unwarned question were that the officers knew Daniels had a history of drug and weapons offenses, "guns are the tools of the drug trade," and either he—despite being handcuffed—or his family members, who would be "free to roam the house as the officers were leaving," could potentially access a weapon the officers had not yet

___

[2]Four codefendants were charged with various counts, and their appeals were consolidated. *Are*, 590 F.3d at 504.

discovered and secured. *Id.*; see *United States v. Edwards*, 885 F.2d 377, 384 (7th Cir. 1989) (finding that questioning a known drug dealer about whether they possess a gun falls within the public safety exception).

¶ 35    Our research reveals, however, that *Newton* and *Are* do not fully represent the federal appellate courts' view of the public safety exception. Other courts have found the exception does not apply in comparable situations, as in *United States v. Benard*, 680 F.3d 1206 (10th Cir. 2012). There, a trooper handcuffed the defendant after finding drugs on his person during a traffic stop. *Id.* at 1209. The trooper then asked, without *Miranda* warnings, what else he might find in Benard's vehicle. *Id.* Benard replied that his girlfriend might have left a gun in the car. *Id.* A loaded handgun was later found inside the vehicle. *Id.* The Tenth Circuit reasoned *Miranda* warnings are not required for an officer to ask a suspect if they have any weapons, so long as the officer has " 'reason to believe (1) that the defendant might have (or recently have had) a weapon, and (2) that someone other than police might gain access to that weapon and inflict harm with it.' " *Id.* at 1212 (quoting *United States v. DeJear*, 552 F.3d 1196, 1201 (10th Cir. 2009)). The trooper lacked any reason to believe either of those circumstances were present when he questioned Benard. Benard was already in custody outside of the vehicle and no facts indicated someone other than the police might gain access to any weapons inside. See *id.*; *United States v. Kissell*, No. 5:18-CR-40001, 2019 WL 6492650 (D. Kan. Dec. 3, 2019) (following *Benard* and rejecting the public safety exception in comparable circumstances for the question " 'Is there anything in the vehicle I should know about?' ").

¶ 36    Accordingly, federal court decisions do not provide us with clear guidance. In any event, we are bound only by decisions of the United States and Illinois Supreme Courts, as lower federal court decisions may be considered only as persuasive authority. *People v. Boss*, 2025 IL App (1st)

221855, ¶ 34. To date, the Illinois Supreme Court has addressed the public safety exception just once.

¶ 37     In *People v. Williams*, 173 Ill. 2d 48 (1996), our supreme court, relying on *Quarles*, found the exception applied to the facts in that case. When police arrived at the scene of a double shooting, the surviving victim informed them the shooter's name was Frank Williams. *Id.* at 55. Officers obtained a warrant to arrest Williams and went to an address where he was believed to be staying. *Id.* Williams's sister answered the door and permitted the officers to enter. *Id.* After Williams was found hiding in the attic, he was arrested, placed in handcuffs, and taken to the backyard. *Id.* at 55-56. While frisking Williams, a detective asked him if he had any guns, knives, or needles on him. *Id.* at 56. Williams replied that he did not, but he had a gun in his coat in the attic. *Id.* A loaded revolver was found just as he had described. *Id.*

¶ 38     Williams unsuccessfully moved to suppress his unwarned statement. *Id.* at 75-76. The supreme court found Williams was entitled to *Miranda* warnings because he was in custody and interrogated, but the public safety exception applied. *Id.* at 77. The court noted that the loaded gun was in the attic of a house occupied by two families, police officers were on the scene, and the concealed gun posed a threat to everyone present. *Id.* Under those circumstances, "it [was] reasonable to find that [the detective] was attempting to secure the safety of himself, his fellow officers, and innocent persons in the area from immediate danger when he asked [Williams] whether he was carrying any weapons." *Id.* at 77-78. The court also noted that the detective did not ask Williams any other questions at that time, indicating his question was not designed to elicit testimonial evidence. *Id.* at 78.

¶ 39     In this case, the firearm found in the bedroom posed a potential threat to the police officers and others at the scene. And when officers are executing a search warrant, an objective need exists

to protect their safety and the safety of others. But Officer Martinez's question, "What am I going to find that should not be here?" did not relate to an objectively reasonable need to protect anyone from an immediate danger. By the time he put the question to Rainey, the officers had control of the premises. The officers were not in an open supermarket, as in *Quarles*, or a building with multiple unrestrained occupants, as in *Williams*. Rainey and all other apartment occupants were handcuffed and guarded. The question was limited to the bedroom, which the officers were about to search. No one other than the officers were going to access the bedroom by that point. Rainey was only present because officers directed him there. Unlike *Quarles* and *Williams*, there was no basis to believe Rainey was recently armed and he had already been searched when Officer Martinez questioned him. Thus, the situation was not "kaleidoscopic," and no immediate danger was apparent to prompt a need for answers to questions without *Miranda* warnings. *Quarles*, 467 U.S. at 656, 659 n.8.

¶ 40      Furthermore, after asking, "What am I going to find that should not be here?" Officer Martinez followed with questions about "dope." Those questions related to Officer Martinez's drug investigation, which was the purpose of the search warrant. The subsequent questioning about drugs distinguishes this case from *Quarles* and *Williams*, where officers did not ask about anything other than weapons. Officer Martinez's further questioning indicates that his initial question did not "relate to an objectively reasonable need to protect the police or the public from any immediate danger" (*id.* at 659 n.8) but was "designed solely to elicit testimonial evidence from a suspect" (*id.* at 659).

¶ 41      Also significant, Officer Martinez's explanation for questioning Rainey did not relate to safety. He was attempting to provide Rainey with an opportunity to avoid having his belongings turned "upside down." In addition, Officer Martinez testified he had already ensured safety before

bringing Rainey to the bedroom and questioning him. The video shows the bedroom and apartment were cluttered. Defense counsel described it as a "hoarder's nightmare on steroids." Yet, Officer Martinez never stated that the condition of the room gave him a safety concern, such as a concealed hazard. Instead, his explanation indicated he simply wanted to make his task of locating contraband easier by inducing Rainey to assist the officers, which would necessarily elicit an incriminating statement. In response to the prosecutor's question, Officer Martinez testified he might be concerned that someone could enter the room. But his answer was hypothetical, stating that it depended on the situation. He offered no facts indicating he had such a concern on this occasion. Thus, Officer Martinez's testimony dispelled that his questions were "reasonably prompted by a concern for the public safety."

¶ 42    For these reasons, we find police obtained Rainey's statements in a custodial interrogation without *Miranda* warnings and his statements were not admissible pursuant to the public safety exception. Thus, the statements should have been suppressed and excluded from the State's case-in-chief.

¶ 43    Although we find a *Miranda* violation occurred, a violation of *Miranda* does not necessarily require reversal; improper admission of a defendant's statements is subject to harmless error review. *Logan*, 2024 IL 129054, ¶ 80. Yet, admission of an unlawfully obtained confession is "rarely harmless error." (Internal quotation marks omitted.) *People v. Cox*, 2023 IL App (1st) 170761, ¶ 56. Differing standards apply in harmless error analysis depending on whether the error was constitutional or purely evidentiary. See *People v. Stull*, 2014 IL App (4th) 120704, ¶ 104. If the error involved a violation of the defendant's constitutional rights, the State must demonstrate beyond a reasonable doubt that the error did not contribute to the verdict. *Cox*, 2023 IL App (1st) 170761, ¶ 56. If the error was purely evidentiary, the State need only show there is no reasonable

probability the jury would have acquitted the defendant absent the error. *Stull*, 2014 IL App (4th) 120704, ¶ 104. The improper admission of a statement obtained when police failed to give *Miranda* warnings is not a violation of a constitutional right, but a violation of *Miranda*'s prophylactic rule. *Logan*, 2024 IL 129054, ¶ 51. Even so, both federal and Illinois courts have applied the beyond a reasonable doubt standard in harmless error analysis of *Miranda* violations. See, *e.g.*, *People v. Wright*, 2016 IL App (5th) 120310, ¶ 33; *Fort*, 2014 IL App (1st) 120037, ¶ 19; *Newton*, 369 F.3d at 679.

¶ 44       In harmless error review, courts may "(1) focus on the error to determine whether it might have contributed to the conviction, (2) examine the other evidence in the case to see if overwhelming evidence supports the conviction, and (3) determine whether the improperly admitted evidence is merely cumulative or duplicates properly admitted evidence." *People v. Salamon*, 2022 IL 125722, ¶ 121.

¶ 45       To convict Rainey of the AHC charge, the State had to prove he (1) either received, sold, possessed, or transferred any firearm and (2) had previously been convicted two or more times of any of the predicate offenses listed in the AHC statute. *People v. Harris*, 2024 IL App (3d) 230406, ¶ 16. The State alleged Rainey possessed the handgun found in the bedroom. Possession can be either actual or constructive. *People v. Brooks*, 2023 IL App (1st) 200435, ¶ 39. As in this case, when the firearm was found near, and not on the defendant's person, the State must prove the defendant had constructive possession of the firearm. *Id.* Constructive possession exists where the defendant (1) had knowledge of the presence of the weapon and (2) exercised immediate and exclusive control over the area where the weapon was found. *Id.* "Knowledge may be demonstrated by evidence of the defendant's 'acts[, declarations,] or conduct, from which it can be inferred that he knew the contraband existed in the place where it was found.' " *Id.* ¶ 40 (quoting *People v.*

*McCurine*, 2019 IL App (1st) 160817, ¶ 24). "Control is established when the defendant has the intent and capability to maintain control and dominion over the weapon, even if he lacks personal present dominion over it." (Internal quotation marks omitted.) *Id.* ¶ 41.

¶ 46        Here, Rainey's statements were the most significant evidence the State presented to prove his constructive possession of the handgun. His responses to Officer Martinez's queries revealed his knowledge of the handgun's presence in the bedroom. Apart from his statements, the State presented slim evidence to support Rainey's constructive possession of the handgun. He was not the only occupant of the apartment or even the bedroom. *Cf. id.* ¶ 42 (citing "the defendant was the only individual inside the apartment when the search warrant was executed" as a factor supporting constructive possession). And the single piece of mail addressed to "Steve Welch" at that address and the handgun were found in separate bags. *Cf. id.* (revolver found under a bed inside a safe, which also contained multiple documents with the defendant's name and mail addressed to him).

¶ 47        More important, the State relied on Rainey's statements in closing argument. The prosecutor repeatedly pointed to the statements as proof of Rainey's possession of the firearm and replayed the video of the statements. *Cf. Wright*, 2016 IL App (5th) 120310, ¶ 34 (finding admission of statements obtained in violation of *Miranda* was not harmless error when prosecutor relied on the statements in closing argument).

¶ 48        For these reasons, we cannot conclude, beyond a reasonable doubt, that the error did not contribute to the verdict or that there is no reasonable probability the jury would have acquitted Rainey absent the error. Therefore, the error was not harmless, and we must vacate the conviction.

¶ 49        Rainey did not challenge the sufficiency of the evidence and only seeks reversal of his conviction and remand for a new trial. Nonetheless, in finding reversible error, we are obliged to

consider whether the evidence was sufficient since, if not, double jeopardy would bar retrial. *People v. Lopez*, 229 Ill. 2d 322, 367 (2008). The inquiry asks "whether, after viewing the evidence in the light most favorable to the State, any rational trier of fact could have found the essential elements of the crime beyond a reasonable doubt." *Id.* We conclude the evidence was sufficient to prove Rainey guilty of AHC. A firearm was found in a room where Rainey was present. Circumstantial evidence supported an inference that he exercised dominion and control over the room. The hospital letter addressed to him, using his alias, at that location implies he had resided there for some time. And Rainey's statements proved he had knowledge of the firearm's presence. We cannot exclude erroneously admitted evidence in our analysis. See *id.* Even though another person was in the bedroom, more than one person can constructively possess a firearm at the same time. *People v. Williams*, 2020 IL App (1st) 163417, ¶ 76. Thus, double jeopardy does not bar retrial, and we remand this matter for a new trial.

¶ 50                                   B. Ammunition Evidence

¶ 51        We exercise our discretion to consider Rainey's contention regarding the admissibility of evidence related to the recovered bullets because this issue is likely to recur on remand. See *Pielet v. Pielet*, 2012 IL 112064, ¶ 56.

¶ 52        Rainey argues the trial court erred in denying his motion *in limine* to exclude evidence of the recovered bullets. He contends this evidence was irrelevant, amounted to evidence of other crimes, and was prejudicial.

¶ 53        We review a trial court's decisions regarding the admission of evidence for an abuse of discretion. *People v. Thompson*, 2020 IL App (1st) 171265, ¶ 84. "An abuse of discretion occurs when the trial court's decision is arbitrary, fanciful, or unreasonable, or where no reasonable person would take the position adopted by the trial court." *Id.*

¶ 54        Rainey contends the bullets are irrelevant since all but three did not match the caliber of the handgun that was recovered. In denying Rainey's motion *in limine*, the trial court stated, "[W]hile he's not being charged specifically for the ammunition, I think there is some relevancy even if it's not necessarily the same caliber as the gun that's recovered." We agree. Evidence is relevant if it has " 'any tendency to make the existence of any fact that is of consequence to the determination of the action more probable or less probable than it would be without the evidence.' " *People v. Bush*, 2023 IL 128747, ¶ 62 (quoting Ill. R. Evid. 401 (eff. Jan. 1, 2011)). The consequential facts here related to Rainey's constructive possession of a firearm. Evidence of the presence of bullets tends to make the presence of a firearm more probable than it would be without the evidence. Bullets and firearms are inherently connected, and a reasonable person would expect that where one is found the other is likely present. See *People v. Free*, 94 Ill. 2d 378, 415-16 (1983) (finding that firearm-related items, including bullets of different calibers, were relevant to prove constructive possession of a firearm). In addition, since the bullets were so numerous, some were in plain view, and some were in a backpack connected to Rainey, evidence of the bullets tended to make it more probable that Rainey knew a firearm was present, regardless of whether the calibers matched. Thus, the trial court did not abuse its discretion in finding evidence of the bullets relevant.

¶ 55        Next, Rainey argues evidence of the bullets was unduly prejudicial because it amounted to evidence of another crime. The other crimes doctrine bars the State from introducing evidence of crimes for which the defendant is not on trial if relevant only to establish their propensity to commit crime. *People v. Thingvold*, 145 Ill. 2d 441, 452 (1991). This doctrine, however, is only implicated by evidence of a crime "separate, distinct, and disconnected" from the crime for which the defendant is charged. *People v. Pikes*, 2013 IL 115171, ¶ 20. Here, recovery of the bullets and the

firearm occurred during the same event and in the same place. Thus, evidence of the bullets was not separate, distinct, or disconnected from the charged offense. Consequently, the other crimes doctrine is not implicated in this case.

¶ 56　　　　For these reasons, we find the trial court did not abuse its discretion by allowing the State to present evidence of the recovered bullets. Nevertheless, the trial court is not foreclosed from considering this issue anew on retrial to account for the suppression of Rainey's statements and any other considerations the parties may raise.

¶ 57　　　　　　　　　　　　　　III. CONCLUSION

¶ 58　　　　Based on the foregoing, we reverse the judgment of the trial court and remand for a new trial. Due to our disposition, we do not address Rainey's contentions regarding sentencing.

¶ 59　　　　Reversed and remanded.

*People v. Rainey*, 2025 IL App (1st) 230639

| | |
|---|---|
| **Decision Under Review:** | Appeal from the Circuit Court of Cook County, No. 22-CR-5627; the Hon. Alfredo Maldonado, Judge, presiding. |
| **Attorneys for Appellant:** | James E. Chadd, Douglas R. Hoff, Rachel S. Sansonetti, and Brooke A. Winterhalter, of State Appellate Defender's Office, of Chicago, for appellant. |
| **Attorneys for Appellee:** | Eileen O'Neill Burke, State's Attorney, of Chicago (John E. Nowak, Whitney Bond, and Jenna McMahon, Assistant State's Attorneys, of counsel), for the People. |